No. 26-60238

# In the United States Court of Appeals For the Fifth Circuit

AMAZON.COM SERVICES LLC;
AMAZON LABOR UNION NO. 1, INTERNATIONAL BROTHERHOOD OF TEAMSTERS
*Petitioners*,

v.

NATIONAL LABOR RELATIONS BOARD,
*Respondent.*

On Petition for Review from the National Labor Relations Board
Case 29-RC-310869

## OPENING BRIEF OF PETITIONER AMAZON.COM SERVICES LLC


Amber M. Rogers
HUNTON ANDREWS KURTH LLP
Fountain Place
1445 Ross Avenue, Suite 3700
Dallas, Texas 75202
Telephone: 214-979-3000

Elbert Lin
Kurt G. Larkin
Kevin S. Elliker
HUNTON ANDREWS KURTH LLP
Riverfront Plaza, East Tower
951 East Byrd Street, Suite 700
Richmond, Virginia 23219
Telephone: 804-788-8200

*Counsel for Petitioner Amazon.com Services LLC*


August 10, 2026

## CERTIFICATE OF INTERESTED PERSONS

*Case No. 26-60238, Amazon.com Services LLC v. National Labor Relations Board.*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal:

s/ Elbert Lin
Elbert Lin

*Counsel for Petitioner*
*Amazon.com Services LLC*

## **STATEMENT REGARDING ORAL ARGUMENT**

This petition raises important questions about the Board's election standards and commitment to maintaining the "laboratory conditions" labor law demands for representation elections. It also presents a serious question about whether Amazon obtained the fair hearing promised by the National Labor Relations Act and Board procedure. Amazon requests oral argument and believes it would aid the Court.

## TABLE OF CONTENTS

Certificate of Interested Persons ........................................................................ ii
Statement Regarding Oral Argument ................................................................. iii
Table of Authorities ............................................................................................ vi
Introduction ............................................................................................................1
Statement of Jurisdiction........................................................................................6
Statement of the Issues...........................................................................................7
Statement of the Case.............................................................................................8
A. The ALU's Escalating Campaign of Intimidation ...............................8
B. The ALU Repeatedly Threatens a Prominent Non-ALU Voter .........14
C. The Board's "Eve-Of-Election" Litigation Strategy That Favored the ALU's Campaign ..........................................................16
D. The Chaotic Election .........................................................................17
E. The One-Sided Post-Election Proceedings ........................................22
1. The Hearing and Regional Director Review............................22
2. The Board..................................................................................26
Summary of Argument.........................................................................................30
Standard of Review ..............................................................................................36
Argument..............................................................................................................37
I. The Board recited the cumulative-impact standard but conducted only an atomized review, requiring a new election. ............................................37
A. The Board's and this Court's precedents require considering the cumulative impact of a party's misconduct. ......................................38
B. The Board acknowledged the cumulative standard, but did not seriously apply it. .............................................................................42
C. The margin of victory does not relieve the Board of the cumulative analysis requirement. ......................................................43
D. Weighed cumulatively, the acknowledged misconduct compels a new election. ..................................................................................45
E. The proper remedy is a new election. ...............................................49
II. The Board repeatedly misapplied its own particularized standards. ............50

A. The Board's decision to replace *Phillips*'s powerlessness inquiry with an unsupported ad hoc multifactor test was arbitrary and capricious. ....51
B. In analyzing the late-election start, the Board imposed a probability analysis that its own precedents forbid. ....55
C. The Board judged the ALU's threats of physical violence on election day under the wrong legal standard. ....59
D. The Board ignored its *Athbro* neutrality standard for its agents' one-sided administration of the election. ....64
III. The Board denied Amazon a fair hearing by affirming a proceeding in which its subordinate officers repeatedly departed from its procedures to Amazon's detriment. ....68
A. The Hearing Officer improperly narrowed Amazon's Objections and then excluded Amazon's evidence based on that narrowing. ....70
1. Board Rules do not allow a Hearing Officer to "dismiss" or narrow objections set for hearing by a Regional Director. ....70
2. The Regional Director's failure to correct the Hearing Officer's errors prejudiced Amazon. ....77
B. The Board let Region 29 prosecute Amazon as its adversary while withholding the Region's own agents and documents. ....79
C. The Board refused meaningfully to address any of these errors on review. ....83
Conclusion ....85
Certificate of Compliance ....87
Certificate of Service ....88

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska Commc'ns Sys. Holdings, Inc. v. NLRB*,
6 F.4th 1291 (D.C. Cir. 2021) ........................................................ 34, 69

*Alco Iron & Metal Co.*,
269 NLRB 590 (1984) ........................................................ 66

*Am-O-Krome Co.*,
92 NLRB 893 (1950) ........................................................ 65

*Athbro Precision Eng'g Corp.*,
166 NLRB 966 (1967) ..................................... 5, 7, 33, 34, 50, 64, 65, 66, 67, 68

*Avis Rent-A-Car Sys., Inc.*,
280 NLRB 580 (1986) ............................. 4, 28, 37, 38, 40, 42, 43, 45, 47, 52, 78

*Baja's Place, Inc.*,
268 NLRB 868 (1984) .......................................... 4, 7, 33, 50, 51, 59, 61, 62, 63

*Be-Lo Stores v. NLRB*,
126 F.3d 268 (4th Cir. 1997) ........................................................ 84

*Boire v. Greyhound Corp.*,
376 U.S. 473 (1964) ........................................................ 6

*Boston Insulated Wire & Cable Sys. v. NLRB*,
703 F.2d 876 (5th Cir. 1983) ........................................................ 36

*Bronx Lobster Place, LLC*,
No. 02-RC-191753, 2018 WL 721396 (NLRB Feb. 2, 2018) ............................ 57

*Cedars-Sinai Med. Ctr.*,
342 NLRB 596 (2004) ........................................................ 62

*Champaign Residential Services, Inc.*,
325 NLRB 687 (1998) ........................................................ 52, 53

*Delta Drilling Co.*,
*406 F.2d 109, 113 (5th Cir. 1969)* ........................................................ 65

*EDS-IDAB, Inc. v. NLRB*,
666 F.2d 971 (5th Cir. Unit B Feb. 4, 1982) ....................................................39

*Edward J. DeBartolo Corp.*,
313 NLRB 382 (1993) ..........................................................................................52

*El Paso Elec. Co. v. NLRB*,
681 F.3d 651 (5th Cir. 2012) ...............................................................................36

*Ensign Sonoma, LLC*,
342 NLRB 933 (2004) ...................................................................................64, 65

*Exeter 1-A Ltd. P'ship v. NLRB*,
596 F.2d 1280 (5th Cir. 1979) .............................................................................45

*Fiber Indus.*,
267 NLRB 840 (1983) ..........................................................................................76

*Fred Meyer Stores, Inc.*,
355 NLRB 541 (2010) ..........................................................................................75

*Fresenius USA Mfg., Inc.*,
352 NLRB 679 (2008) ..........................................................................................38

*Gen. Shoe Corp.*,
77 NLRB 124 (1948) .........................................................................................1, 58

*Glacier Packing Co.*,
210 NLRB 571 (1974) ..........................................................................................66

*Holdings Acquisition Co. L.P.*,
356 NLRB 1151 (2011) ...................................................................................38, 60

*Home Town Foods, Inc. v. NLRB ("Home Town Foods II")*,
416 F.2d 392 (5th Cir. 1969) ........................................................................49, 55

*Home Town Foods, Inc. v. NLRB ("Home Town Foods I")*,
379 F.2d 241 (5th Cir. 1967) ..................................................4, 37, 39, 42, 49, 64

*Howell Refining Co. v. NLRB*,
400 F.2d 213 (5th Cir. 1968) ...............................................................................39

*Hudson Aviation Servs.*,
288 NLRB 870 (1988) ........................................................................64

*King v. Amazon.com Servs. LLC*,
No. 22-cv-01479, 2022 WL 17083273 (E.D.N.Y. Nov. 18, 2022)........16, 17, 45

*Lamar Co.*,
340 NLRB 979 (2003) ........................................................................61

*Milchem Inc.*,
170 NLRB 362 (1968) ........................................................................68

*N. of Mkt. Senior Servs., Inc. v. NLRB*,
204 F.3d 1163 (D.C. Cir. 2000)........................................................66

*Nat'l Auto. Dealers Ass'n v. FTC*,
127 F.4th 549 (5th Cir. 2025) ......................................................36, 70

*NLRB v. Capitol Fish Co.*,
294 F.2d 868 (5th Cir. 1961) ..................................................35, 69, 83

*NLRB v. Carlton McLendon Furniture Co.*,
488 F.2d 58 (5th Cir. 1974) ........................................................40, 41

*NLRB v. Claxton Mfg.*,
613 F.2d 1364 (5th Cir. 1980) ......................................................41, 44

*NLRB v. McCarty Farms, Inc.*,
24 F.3d 725 (5th Cir. 1994) ......................................39, 55, 59, 63, 64

*NLRB v. Mr. Fine, Inc.*,
516 F.2d 60 (5th Cir. 1975) ..............................................................69

*NLRB v. Osborn Transp., Inc.*,
589 F.2d 1275 (5th Cir. 1979) ..........................................5, 36, 51, 54

*NLRB v. Rolligon Corp.*,
702 F.2d 589 (5th Cir. 1983) ............................................................44

*NLRB v. Smith Indus.*,
403 F.2d 889 (5th Cir. 1968) ............................................................41

*NLRB v. State Plating & Finishing Co.*,
738 F.2d 733 (6th Cir. 1984) ....................................................................65

*NLRB v. Trancoa Chem. Corp.*,
303 F.2d 456 (1st Cir. 1962)......................................................................44

*NLRB v. Van Gorp Corp.*,
615 F.2d 759 (8th Cir. 1980) ......................................................................40

*Pea Ridge Iron Ore Co.*,
335 NLRB 161 (2001) ............................................... 5, 7, 32, 33, 50, 56, 58, 59

*Phillips Chrysler Plymouth*,
304 NLRB 16 (1991) .......... 3, 4, 7, 28, 29, 32, 45, 50, 51, 52, 53, 54, 55, 72, 78

*Polymers, Inc.*,
174 NLRB 282 (1969) ..................................................................................67

*Poor v. Amazon.com Servs. LLC*,
104 F.4th 433 (2d Cir. 2024) .......................................................................17

*Prof'l Transp., Inc.*,
370 NLRB No. 132 (2021) ......................................................................1, 58

*PruittHealth-Va. Park, LLC v. NLRB*,
888 F.3d 1285 (D.C. Cir. 2018)..............................................................40, 42

*Refresco Beverages US Inc.*,
No. 22-RC-276628, 2022 WL 1046078 (NLRB Apr. 5, 2022) ..5, 32, 33, 56, 57, 58, 59

*Renew Home Health v. NLRB*,
95 F.4th 231 (5th Cir. 2024) .......................................................................84

*Robbins & Myers*,
241 NLRB 102 (1979) ..................................................................................28

*Scientific Atlanta, Inc.*,
278 NLRB 467 (1986) ..................................................................................45

*Skyline Corp. v. NLRB*,
613 F.2d 1328 (5th Cir. 1980) ................................................................51, 68

*Springfield Terrace*,
355 NLRB 937 (2010) .......................................................................... 69

*Station Operators, Inc.*,
307 NLRB 263 (1992) .......................................................................... 52

*Super Thrift Markets, Inc.*,
233 NLRB 409 (1977) .......................................................................... 63

*Swing Staging v. NLRB*,
994 F.2d 859 (D.C. Cir. 1993) ............................................................. 39

*Texas v. EPA*,
122 F.4th 1008 (5th Cir. 2024) ........................................................... 84

*UNF West, Inc. v. NLRB*,
844 F.3d 451 (5th Cir. 2016) ............................................................... 62

*United States v. Delgado*,
672 F.3d 320 (5th Cir. 2012) (en banc) ............................................... 41

*United Steelworkers of Am. v. NLRB*,
496 F.2d 1342 (5th Cir. 1974) ............................................................. 44

*Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*,
985 F.3d 472 (5th Cir. 2021) ............................................................... 36

*Universal Camera Corp. v. NLRB*,
340 U.S. 474 (1951) ............................................................................. 36

*Van Leer Containers*,
298 NLRB 600 (1990) .......................................................................... 59

*Westwood Horizons Hotel*,
270 NLRB 802 (1984) .......................................................................... 62

*Wolverine Dispatch, Inc.*,
321 NLRB 796 (1996) .................................................................. 56, 57, 58

**Statutes**

29 U.S.C. § 152(13) ..................................................................................... 9, 10

29 U.S.C. § 158(b)(1) ...................................................................................... 59

29 U.S.C. § 159(d) ....................................................................................6

29 U.S.C. § 160(f) .....................................................................................6

**Other Authorities**

29 C.F.R. § 102.1(h) ...............................................................................80

29 C.F.R. § 102.64(b) .................................................................73, 74, 75

29 C.F.R. § 102.69(a)(8) .........................................................................70

29 C.F.R. § 102.69(c)(1)(i) ..................................................................73, 75

29 C.F.R. § 102.69(c)(1)(ii) .......................................................................71

29 C.F.R. § 102.69(c)(1)(iii) .....................................................................79

*Section 10(j) Injunctions—Litigation Success Rate Report*, https://www.nlrb.gov/reports/nlrb-case-activity-reports/section-10j-injunctions-litigation-success-rate-report....................................................17

Karen Weise, *N.L.R.B. sues Amazon over labor practices at a Staten Island facility*, N.Y. Times (Mar. 17, 2022) .....................................................17

*Staten Island Union. They Overcame It All*, THE INTERCEPT (Apr. 2, 2022), https://theintercept.com/2022/04/02/amazon-union-staten-island/ ..........................................................................................72

## INTRODUCTION

The purpose of a representation election is to provide an opportunity, "under conditions as nearly ideal as possible, to determine the uninhibited desires of the employees." *Gen. Shoe Corp.*, 77 NLRB 124, 127 (1948). Since its inception, the National Labor Relations Board ("NLRB" or "Board") "has zealously safeguarded the integrity of its elections against irregularity and even the appearance of irregularity." *Prof'l Transp., Inc.*, 370 NLRB No. 132, slip op. at 1 (2021). When that standard drops "too low, because of [the Board's] fault or that of others, the requisite laboratory conditions are not present and the experiment must be conducted over again." *Gen. Shoe Corp.*, 77 NLRB at 127. This case is the paradigm of such a failure. The election here—through the Board's own actions and those of the petitioning union—fell well short of those conditions in numerous independent ways.

This appeal challenges an NLRB order directing Amazon to bargain with the Amazon Labor Union ("ALU"), which petitioned in late 2021 to represent hourly employees ("Associates") at Amazon's JFK8 fulfillment center in Staten Island. Only 32 percent of the eligible Associates voted for the Union. Nearly 3,500 eligible voters—about 42 percent—did not vote at all.

During a 24-day objections hearing following the election, Amazon demonstrated why laboratory conditions weren't present. Before the election, the

ALU engaged in repeated misconduct that undermined employee free choice. Its President, Christian Smalls, pursued what he called a "militant" strategy designed to show employees Amazon was powerless against the ALU. Smalls was not an Amazon employee and thus had no right to be on Amazon's property for any purpose. Yet he openly and repeatedly trespassed on Amazon property to campaign, distribute marijuana to Associates, and film promotional videos—despite multiple cease-and-desist demands and police orders. He led a rally to the front door of the JFK8 building, chanting "FUCK JEFF BEZOS" into a megaphone. And he publicized all of these events on social media. At the same time, other ALU officers intentionally disrupted Amazon's own campaign, forced the cancellation of multiple employer meetings, and destroyed Amazon's lawful employee communications.

After police finally arrested Smalls for trespassing and other ALU agents for interfering with his arrest, the Union turned the arrests into a misleading closing argument. It broadcast edited video of the arrests on social media and distributed flyers at JFK8 mischaracterizing and sensationalizing the incident. Hours before the polls opened, the ALU projected messages about the arrests across JFK8's front facade, including the words "THEY ARRESTED YOUR CO-WORKERS" in a light projection so large it covered nearly the entire front of the building.

The ALU's Vice-President, its Organizing Chair, and other Union agents and organizers also repeatedly threatened violence against a prominent anti-union

Associate on the first day of voting. In front of a breakroom full of voters, they called her a "fucking traitor" and "fucking bitch," and screamed that they were going to "kick [her] ass in the parking lot," "take [her] outside," and "beat [her] up." Bystanders had to intervene to protect her.

For its part, the NLRB failed to preserve conditions ideal to assess employee choice. Its Region 29 office, charged with administering the election, mismanaged the process from beginning to end. Board Agents were tardy, the polls opened late, the election was halted at one point to reconfigure voting lines, and the Board's insufficient staffing caused an extraordinary backup that took hours beyond the scheduled polling times to accommodate. Board Agents also failed to prevent media members from entering the no-electioneering zone, where they filmed and questioned voters on live television. At the same time, Board Agents repeatedly required Company supporters to cover their "Vote No" messaging while permitting hundreds of voters to continue wearing the ALU's "Vote Yes" lanyards and other insignia.

If ever an NLRB election should be overturned, it is this one. The conditions here did not live up to the standards required by the Board's and this Court's precedent. That precedent has two dimensions: particularized rules the Board has adopted for evaluating common forms of interference standing alone, *see, e.g.*, *Phillips Chrysler Plymouth*, 304 NLRB 16 (1991) (trespass), and then a holistic look

that requires considering the defects' combined effect, including their number, severity, and persistence, *see, e.g.*, *Avis Rent-A-Car Sys., Inc.*, 280 NLRB 580, 581 (1986); *Home Town Foods, Inc. v. NLRB ("Home Town Foods I")*, 379 F.2d 241, 244 (5th Cir. 1967). This election failed in both respects, and the Board erred in not concluding as much.

To begin, the Board gave lip service to the holistic analysis but did not seriously apply it. It acknowledged much of the alleged misconduct, but evaluated each Objection *only* on an individual basis: the election-day threats were a "single incident"; the meeting disruptions were "isolated"; the trespassing occurred "well before the election." ROA.9686-87. And so on. The dissenting Board member properly conducted the required totality analysis and concluded "the election must be set aside," based on just a fraction of the ALU's misconduct. ROA.9692. In response, the Board majority stated in a single sentence that Amazon's Objections failed "cumulatively." ROA.9688. But the majority weighed no evidence and supplied no reasoning. That is a conclusory assertion, not a cumulative analysis.

The Board also erred in its individualized analysis, by repeatedly failing to follow the correct, controlling particularized standards. It did not address whether Smalls's trespass campaign conveyed Amazon's powerlessness to protect its property under the *Phillips* standard; whether the threats by union agents of a voter on election day crossed the objective threshold under *Baja's Place*; whether the

delayed start of voting triggered the objective re-run rule under its *Pea Ridge* and *Refresco* decisions; or whether Board Agents' disparate enforcement of insignia rules reasonably conveyed partiality under its *Athbro* test. An agency acts arbitrarily when it ignores the standards established by its own precedent. *NLRB v. Osborn Transp., Inc.*, 589 F.2d 1275, 1279 (5th Cir. 1979).

Finally, the post-election hearing was fundamentally unfair. The Board's subordinate officials, rather than carrying out their charge to compile a complete record, systematically excluded Amazon's evidence at every turn. They improperly displaced Amazon's Objections with their own much-abbreviated versions and then rejected reams of evidence based on those rewrites. They also inappropriately appointed representatives to "defend" Region 29 at the hearing. Those representatives abandoned their role as neutral record-builders and functioned as anti-Amazon partisans. The Board then failed to grapple with any of these serious irregularities and instead relied on the resulting evidentiary gaps to support certification.

By the Board's own standards, this election utterly failed to meet the promised laboratory conditions. The proper remedy is to direct the Board to conduct the experiment again. This Court should grant the petition, vacate the certification, deny enforcement, and remand with instructions to the Board to rerun the election on the petition filed by the ALU on December 22, 2021.

## STATEMENT OF JURISDICTION

On August 29, 2024, the Board entered its decision overruling Amazon's election Objections and certifying the ALU as the bargaining representative of the JFK8 unit. ROA.9682. Because the certification was not directly reviewable, Amazon declined to bargain and litigated the resulting unfair-labor-practice charge. *See Boire v. Greyhound Corp.*, 376 U.S. 473 (1964); 29 U.S.C. § 159(d).

On April 1, 2026, the Board entered its final order finding that Amazon violated Sections 8(a)(5) and (1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(5), (1). ROA.10252. Amazon timely petitioned for review on April 10, 2026. This Court has jurisdiction under 29 U.S.C. § 160(f) to review not only the unfair-labor-practice charge but also the ALU's certification. *See Boire*, 376 U.S. at 473.

## STATEMENT OF THE ISSUES

1. Whether the Board's failure to properly conduct the cumulative analysis required by the Board's and this Court's precedent requires setting aside the Board's order, vacating the certification, and directing a new election.

2. Whether in conducting its individualized review of each Objection, the Board departed from or misapplied its controlling standards for particular categories of oft-occurring election objections—*i.e.*, union trespass (*Phillips*), poll-timing irregularities (*Pea Ridge*), agent threats (*Baja's Place*), and Board-agent neutrality (*Athbro*)—and whether those errors each independently require setting aside the Board's order, vacating the certification, and directing a new election.

3. In the alternative, whether the Board denied Amazon the fair hearing the NLRA and due process require by repeatedly ignoring its own rules and procedures to refuse volumes of Amazon's evidence—and only Amazon's evidence—and also allowing the accused Region to litigate as Amazon's adversary while simultaneously refusing to allow any discovery into that Region's agents and documents.

## STATEMENT OF THE CASE[1]

JFK8 is a large Amazon fulfillment center on Staten Island that employed more than 8,000 hourly Associates during the relevant period. ROA.5611-5616. On December 22, 2021, the ALU petitioned Region 29 to represent the JFK8 Associates. ROA.5609-5610. Amazon and the ALU entered into a stipulated election agreement—approved and enforced by the Region—providing for a secret-ballot manual election in an outdoor tent in Amazon's parking lot. Voting would occur over five days between March 25 and 30, 2022, in two daily sessions (8:00 a.m. to 1:00 p.m. and 8:00 p.m. to 1:00 a.m.). ROA.317; ROA.5612-5616. Of approximately 8,325 eligible voters, only 4,785 cast valid ballots—under 58 percent.[2] The ALU prevailed by just 523 votes—2,654 to 2,131—a margin far below the roughly 3,500 eligible voters who did not vote at all. ROA.5611.

### A. The ALU's Escalating Campaign of Intimidation

The ALU's campaign was led by a small group of officers and organizers who sat on its Executive Board: Christian Smalls (Interim President), Connor Spence and Derrick Palmer (Vice Presidents), Angelika Maldonado (Chair of the Organizing Committee), and Brett Daniels (Director of Organizing). Lead organizers Jason

[1] Unless otherwise noted, all facts cited in this brief are undisputed.

[2] The Parties challenged a total of 67 ballots and 17 ballots were voided. ROA.5611.

Anthony and Cassio Mendoza handled phone banking, flyers, recruiting in JFK8's breakroom, distribution of yellow "Vote Yes" lanyards, rallies, and social media. ROA.3604-3605; ROA.3612; ROA.3522; ROA.4338-4339. All of them, save Smalls, were current employees of JFK8, and the ALU stipulated that Smalls, Spence, Palmer, Maldonado, and Daniels were its agents during the critical period, ROA.4149, making their conduct attributable to the ALU under § 2 of the Act, *see* 29 U.S.C. § 152(13). Anthony and Mendoza also served as ALU Observers at the election. ROA.3476; ROA.5027; ROA.6918.

The ALU's strategy, in Smalls's words, was to be "militant" and "aggressive on the front line" to show the workers "that we have collective power." ROA.4547. Early on, Smalls made clear that despite being a non-employee, he intended to enter Amazon's property at will. His first publicized trespass, on December 14, 2021, was recorded and posted to TikTok, showing ALU officers distributing marijuana,[3] T-shirts, and pizza while soliciting Associates' support, all on JFK8 property. ROA.5727-5728; E0322.2-v.[4] The caption boasted, "Amazon rerouted the business

[3] During the hearing, Smalls denied that the ALU distributed marijuana during the period between the filing of the petition and the vote. ROA.4602. However, other witnesses testified that the ALU did distribute marijuana to voters during that period. ROA.3083-3084; ROA.4010.

[4] The Board transmitted multimedia files to the Court as part of the record without assigning an ROA number. Amazon cites to the underlying hearing exhibit number when citing to these materials.

from our bus stop so we just set up in their parking lot instead." ROA.5729. On December 15, Amazon sent a cease-and-desist letter, but Smalls and other ALU-affiliated non-employees returned that same night. ROA.1830-1831; ROA.1852-1853; ROA.5727-5729. The next day, Amazon sent another cease-and-desist letter. ROA.1876-1877; ROA.5730-5732. Smalls posted these letters on social media, mocking them. ROA.5733.

Throughout January 2022, Smalls continued to trespass and boasted about his conduct on social media. ROA.5734-5739, E0325.1-v; ROA.6331, E0860-v; ROA.6332-6333, E0861-v; ROA.6903-6904, E2805-v, E2808-v. For example, the ALU staged a rally on JFK8 property on Dr. Martin Luther King, Jr. Day. ROA.6331, E0860-v. During the rally, Smalls stood in front of the main JFK8 building entrance—Amazon property—and repeatedly chanted "FUCK JEFF BEZOS" into a megaphone, encouraging the assembled crowd to chant it with him in call-and-response fashion. ROA.6903, E2805-v. The ALU then posted a video of Smalls's actions to social media. *Id*.

Smalls was not the only ALU disrupter. In response to the ALU's organizing activities, Amazon held a series of small-group meetings to communicate with Associates. ROA.192-196. On February 7, 2022, ALU officers, agents, and supporters entered uninvited through an unmonitored side door and interrupted one meeting. ROA.286, E0304-v; ROA.1915, E0581-v at 10:55; ROA.2973-2980. They

chanted slogans, distributed literature, shouted over Amazon's presenters, and made it impossible for the meeting to continue. ROA.286, E0304-v; ROA.1109; ROA.1915; ROA.2978. Attendees were shaken; one Associate feared the intruders might be armed. ROA.1167. The ALU recorded the disruption and later disseminated the video on ALU social media and to news outlets. ROA.286, E0304-v; ROA.3470. When ordered to leave, the ALU disrupters refused, forcing Amazon to end two meetings prematurely and eventually cancel five more after the ALU vowed to "shut it down." ROA.237; ROA.286, E0304-v; ROA.313-314; ROA.1116; ROA.1915, E0581-v; ROA.6079; ROA.6329. The ALU then publicly celebrated on numerous social media outlets that it had "shut [Amazon's meetings] down." ROA.5722; ROA.5792-5795; ROA.6079; ROA.6330.

A few weeks later, and less than twenty-four hours after Amazon began to hang campaign posters in the building, ALU officers were caught on CCTV tearing down and destroying Amazon's lawful information posters. ROA.296-297; ROA.304-312, E0308.1-v, E0308.2-v, E0309-v, E0310-v.

In the meantime, Smalls continued his repeated trespassing. He appeared again on February 9, this time "with a camera crew that appeared to be filming" the inside of the breakroom. ROA.2402-2403. When instructed by a manager to leave, Smalls told the manager to "go ahead and call the cops" because he would not leave.

ROA.2405. Two days later, Smalls and a cameraman trespassed once more and stayed for approximately 45 minutes. ROA.1890-1891.

On February 23, Smalls's trespassing reached its climax. He entered Amazon property again with a camera crew and remained for over an hour and fifteen minutes—staring into breakroom windows, talking with Associates, and filming. ROA.1892-1895. Managers told Smalls he was trespassing and needed to leave, but Smalls responded that he was filming an interview and would leave when finished. ROA.2409. When managers repeated the instruction, Smalls dared them to call the police. ROA.2410. The managers did so, explaining to the authorities that Smalls and the camera crew were refusing to leave and asking that the situation be handled with discretion and without becoming contentious. ROA.1896; ROA.2412.

When the NYPD arrived approximately 30 minutes later, both managers and police officers told Smalls he was trespassing and needed to leave. ROA.1896-1897; ROA.2418-2420. Officers repeatedly warned he would be arrested, first giving him two minutes, then thirty seconds, then ten seconds. ROA.2420; ROA.2434-2435; E0335-v; ROA.5747; E0344-v. Smalls did not leave. ROA.1900; ROA.2420-2422. Anthony and Daniels, who were on the scene in a group of ALU agents and supporters, placed themselves between Smalls and the police; CCTV showed Anthony moving aggressively toward and making physical contact with an officer, and Daniels making contact with two officers. ROA.2420-2423; E0335-v;

ROA.5747; E0344-v. All three were arrested. ROA.2420-2423. Smalls was charged with resisting arrest, obstructing governmental administration, and trespass. ROA.5786. After his release, Smalls posted to social media that he "rushed back" to JFK8 for the night shift. ROA.6932.

The ALU immediately amplified the arrest across multiple channels—posting video to social media, circulating flyers, and directing Associates to the footage on Amazon's Voice of the Associates ("VOA") board, an electronic message board at the JFK8 facility that allowed Associates to publicly voice concerns, raise questions, or share recognition. ROA.956-957; ROA.5658-5659; ROA.5740-5741; E0326-v; ROA.5745-5746; ROA.5748; ROA.6322-6323; E0757-v; E0758-v; ROA.6906; ROA.6930-6932; E3218-v. And on the night before voting, while night-shift Associates were outside on break, the ALU delivered its final pre-election message by projecting campaign slogans onto the face of the JFK8 building itself, including, "THEY ARRESTED YOUR COWORKERS," "VOTE YES! FOR THE ALU," "BE THE FIRST IN HISTORY," "THEY FIRED SOMEONE YOU KNOW," "ALU FOR THE WIN," and "BEZOS FLEW TO SPACE OFF YOUR LABOR." ROA.4190-4195; ROA.5752-5763; ROA.6913-6916; E0385-v; E2923v-2926v. The ALU posted photographs and videos of the projections on social media. ROA.5755-5763; ROA.6913-6916; E0385-v; E2923v-2926v.

The ALU's own statements show what message it intended to send and how it understood the arrest's effect. Smalls later bragged that his arrest "was a gem," and he insisted "workers were upset about me getting arrested" and called it "the turning point" when Amazon "lost the election." ROA.4589-4591, E0367-v at 41:07-41:48.[5] Lead organizer Pasquale Cioffi testified that the video "was all over Amazon." ROA.4975.

### B. The ALU Repeatedly Threatens a Prominent Non-ALU Voter

The ALU continued its "militant" message on Election Day. ROA.4547. Natalie Monarrez—a formerly prominent ALU organizer who had publicly switched to "vote no"—experienced that message personally. ROA.4023-4024. On the morning of March 25, the first day of the election, Monarrez encountered Lead ALU organizer Anthony in the main breakroom. ROA.4021-4022. Anthony cursed at her, calling her a "fucking bitch" and "fucking traitor," ROA.4024, advancing on her, and putting his finger in her face, ROA.4024-4025. Anthony eventually positioned himself so close to Monarrez while continuing to berate her that she had to step back to avoid contact. ROA.4024-4025.

Later that day, when Monarrez returned to the breakroom with a sign stating she did not support the ALU, stipulated agents Palmer, Maldonado, and Daniels

[5] The Hearing Officer rejected these admissions from Smalls—made on a podcast—on the ground that he did not make them until after the election. ROA.4591.

"immediately ran up to [her]," "scream[ed] and curs[ed] at [her]," tried to "grab [her] sign," and called her a "traitor" and a "bitch" who had "no fucking right to hold the sign." ROA.4056-4065. Monarrez described the chaotic and threatening confrontation, including its effect on various bystanders, as follows:

> The yelling and the cursing and screaming continued. And it got so bad that other workers who were enjoying their break actually got up from their tables and chairs and walked over and stood in between myself and Derrick and Angelika and Brett and tried to get them to back up and to be quiet. And they were telling them to all leave me alone. And the three of them did not stop. They continued yelling, continued cursing. Angelika started pulling up pictures of me on her phone with the ALU and was shoving her phone into people's faces, screaming that I used to be a part of the ALU and that I had no right to vote no. And the screaming and cursing continued. I just stood there. And maybe a few minutes later, eventually Brett Daniels got tired of being lectured by the other workers who were telling him to be quiet and leave me alone. He left the break room. And then an older gentleman was still giving a lecture to Derrick Palmer explaining to him that he had no right to come at me the way that he did.

ROA.4057-4058.

Maldonado then called Smalls on her cell phone to report that Monarrez was "in here holding a sign" reading "'I'm voting no'" and ask "What should I do?" ROA.4058. Maldonado photographed Monarrez holding the sign and then began to threaten Monarrez again. ROA.4058-4059. As Monarrez testified:

> So Angelika Maldonado walked up to me and continued screaming and cursing at me, saying that I didn't know who I was dealing with because she was the head of the Workers' Committee, she was in the ALU. I didn't know who I was messing with. *She was going to kick my ass in the parking lot. She was going to take me outside. She was going to beat me up.* She would not be quiet. And eventually, other people walking by kept telling her to be quiet.

ROA.4059 (emphasis added).

That evening, Monarrez posted on the VOA Board about the ALU's harassment and bullying from earlier in the day, reporting "[i]n the past week, I have been on the receiving end of 3 ALU boys laughing at me, giving me attitude, & yelling at me (on the premises)." ROA.5766. In response, Anthony verbally attacked Monarrez again, this time on the VOA Board, accusing Monarrez of "putting all women against the union" and calling her "the most racist person that [he has] ever known." ROA.3692-3693; ROA.5661. Mendoza also texted Monarrez to "stop with the sign," warning that the ALU would send the video of Monarrez holding the sign to a congressional candidate for whom Monarrez volunteered. ROA.6340-6345.

### C. The Board's "Eve-Of-Election" Litigation Strategy That Favored the ALU's Campaign

The ALU was not alone in shaping the election atmosphere. A week before the election, Region 29 filed a § 10(j) petition in the Eastern District of New York seeking the immediate reinstatement of a JFK8 employee that Amazon had terminated *two years earlier* for directing a prolonged stream of misogynist and defamatory profanities at a co-worker over a bullhorn. *King v. Amazon.com Servs. LLC*, No. 22-cv-01479, 2022 WL 17083273, at *2 (E.D.N.Y. Nov. 18, 2022). That employee had filed a ULP charge when he was terminated, and yet the Region waited until the eve of the election to bring suit.

By Region 29's own admission, the timing was not coincidental. When the Region filed, it argued that reinstatement "was necessary in advance of the ALU election." *Id*. at *3. The Region 29 Director then publicly linked the filing to employees' organizing efforts "during a union election."[6]

The petition failed months later—long after the campaign and election had concluded. The district court eventually denied reinstatement while granting a limited cease-and-desist order regarding concerted activity. *King*, 2022 WL 17083273, at *9-11. And that order was subsequently vacated on appeal. *Poor v. Amazon.com Servs. LLC*, 104 F.4th 433, 444 (2d Cir. 2024).[7]

### D. The Chaotic Election

On March 22, 2022, Region 29 met with both parties, inspected the site, approved the tent layout and set-up for voting lines, and set the no-electioneering zone—marked by orange barriers and including the sidewalk in front of the building and the first two driving lanes. ROA.322; ROA.2284-2289; ROA.2320-2327;

---

[6] Karen Weise, *N.L.R.B. sues Amazon over labor practices at a Staten Island facility*, N.Y. Times (Mar. 17, 2022), https://www.nytimes.com/2022/03/17/business/amazon-staten-island-facility.html.

[7] In that period, the Board otherwise had been relatively successful in Section 10(j) cases: it prevailed in 100 percent of reported cases in 2020, 75 percent in 2021, and 78 percent in 2022. *See* Nat'l Lab. Rels. Bd., *Section 10(j) Injunctions—Litigation Success Rate Report*, https://www.nlrb.gov/reports/nlrb-case-activity-reports/section-10j-injunctions-litigation-success-rate-report (last visited Aug. 6, 2026).

ROA.5612-5616. At the ALU's and Region's insistence, Amazon covered exterior surveillance cameras facing the lot—thereby eliminating its ability to document election-day violations, and ceding to the Board any prevention of unauthorized third parties, including the media, from trespassing during the election. ROA.335; ROA.341. Amazon told the Region it was concerned about interference and that the Board would need to police the voting area; the Region responded that policing the entire parking lot would be "physically impossible" but that it "would do its best." ROA.2307-2308. Amazon also suggested that the tent had room for more voting tables, but the Region rejected the suggestion, calling the number "more than sufficient." ROA.2290-2291.

Although voting was scheduled for 8:00 a.m. on March 25, it did not begin until roughly 8:10 a.m. to 8:12 a.m. ROA.1356; ROA.2152-2153. At 7:59 a.m., when Amazon's representatives were asked to leave the tent, the ballot boxes had not been built, no one was seated at the voter check-in tables, and the Board Agent had not set the official time piece. ROA.357-358. Only after the Amazon representatives left did the Board Agent construct and tape the ballot boxes, one at a time and unassisted, a process taking five to ten minutes. ROA.604; ROA.660; ROA.1355-1356.

The disorder continued once voting started. The line became long and confusing, stretching through the parking lot and onto the sidewalk. ROA.757-758;

ROA.848-849; ROA.6103. Some voters abandoned the line, and one voter testified he was dissuaded from getting in line at all. ROA.848-849. Others waited for hours merely to reach the tent, and then waited still longer inside before reaching a check-in table. ROA.1063; ROA.2500-2502; ROA.3092-3093; ROA.3099-3100. About half an hour into the morning session, Board Agents stopped the election for approximately 5-6 minutes to reconfigure one line into three alphabetical lines, pulling voters with certain last-name initials to the front and leaving others to wait. ROA.619. By noon the line still wrapped around the building. ROA.6101.

Scheduled to end at 1:00 p.m., the morning session did not conclude until about 2:45 to 2:50 p.m., by which time the boxes had already been sealed despite Amazon's request to observe the sealing. ROA.373; ROA.564-566; ROA.2293-2294; ROA.2334-2335. The area was "messy": line-control stanchions were scattered "all over the place" and some were broken. ROA.393-395. With Board approval, Amazon reorganized the line barriers and erected a mesh barrier to block media access to Associates waiting to vote. ROA.403-405. The Region again rejected Amazon's suggestion to assemble additional voting booths, attributing the chaos to the notion that "[A]ssociates didn't know their last names." ROA.399; ROA.401; ROA.2336-2337.

The Board also failed to protect the no-electioneering zone it had defined. Throughout the March 25 morning session, media members had repeatedly entered

or hovered beside the zone, photographing and filming voters in line and asking some how and why they voted. ROA.1402-1404. Photographs appeared online the same day from Reuters, Apple News, and the New York Post. ROA.772-773; ROA.5618-5628; ROA.5629-5639; ROA.10268-10271. Board Agents stood within view but, voters testified, never approached or stopped any media member. ROA.819; ROA.1083; ROA.1248; ROA.1402. Indeed, the Board Agents are in numerous pictures that appeared in the news and online. ROA.419; ROA.5640. Amazon had to remove some media members from other areas of the property, and when it asked for additional Board Agents, the Region replied only that "we can't see everything but we're doing the best we can." ROA.2343.

The Board was equally ineffective against the ALU's misconduct. During the March 25 morning session, Smalls was repeatedly seen in or near the no-electioneering zone in a bright red ALU shirt with a cameraman. At one point, Smalls stood within five feet of a voter who was standing in line, while the cameraman accompanying Smalls took the voter's picture over her objection. ROA.2182-2183; *compare* ROA.6102 *with* ROA.6105.[8] Later, Smalls parked his

[8]Although at least six witnesses provided unrebutted testimony placing Smalls in or around the voting area during the election, the Hearing Officer either discredited or otherwise rejected all of that testimony, including testimony of one hourly Associate who testified Smalls stood in line with almost 200 voters present, with a cameraman, while she watched. ROA.2163-2174.

SUV in the first car lane directly in front of the building. ROA.2231-2232; ROA.6105. On March 28, five ALU agents including Daniels were seen between the entrance and the tent speaking with voters in line while one recorded the line. ROA.2803-2804. And during the March 28 and 29 evening sessions, ALU Observer Mendoza, stationed inside the tent, gave "thumbs up" and a "big smile" to voters inside the tent, many wearing ALU lanyards, without any Board Agent stopping him. ROA.2892-2898.

Board Agents also repeatedly barred or curtailed "Vote No" expression while permitting "Vote Yes" advocacy inside the tent. When former ALU-supporter Monarrez—the same Associate who had publicly switched to "Vote No" and later faced ALU threats—approached with her sign reading "I LEFT ALU" and "I'M VOTING NO," a Board Agent announced that "nobody was allowed to have any signs or any T-shirts that said anything at all about the election." ROA.4014-4015. Board Agents required another Associate to cover three anti-ALU buttons before allowing him into the tent and told at least three voters wearing "VOTE NO" shirts they could not vote unless they covered their shirts, because there was "no politicking" allowed in the tent. ROA.719; ROA.995-997; ROA.1644-1645; ROA.2699-2700; ROA.5776. ALU Observer Mendoza admitted that Board Agents told Observers to alert them to anyone wearing a "Vote No" shirt. ROA.5033-5034.

In contrast, Board Agents allowed into the tent hundreds of voters wearing the ALU's yellow "Vote Yes" lanyard. ROA.996-997; ROA.1304-1305; ROA.2873-2874; ROA.2771-2772; ROA.3093; ROA.3247-3248. These yellow lanyards conveyed pro-ALU messaging and depicted alternating images of a fist punching through a box with the phrase "amazon LABOR UNION" written next to it, and the words "VOTE YES" placed next to a check mark in a box. ROA.6279. These images covered the entire length of the lanyard. ROA.6279. Board Agents also permitted ALU Observers Daniels and Mendoza, who spent 5 hours sitting at the same table in the voting tent with their respective Board Agent, to wear pro-ALU shirts and buttons while working the tables. ROA.996-997; ROA.1304-1305; ROA.2770-2772; ROA.2873-2874; ROA.2879-2881; ROA.2884; ROA.3082; ROA.3101-3102; ROA.3247-3248; ROA.6279.

### E. The One-Sided Post-Election Proceedings

#### 1. The Hearing and Regional Director Review

After the election, Amazon timely filed 25 Objections to conduct affecting the results of the election, supported by a 191-page offer of proof that previewed the witnesses and evidence Amazon would present if permitted to litigate those Objections. ROA.6981-6997. At the same time, Amazon moved to transfer the proceeding out of Region 29, given its conduct was the subject of many of those Objections. ROA.6998-7000. The Board's General Counsel transferred the case to

Region 28, in Phoenix, AZ. ROA.7001. The Regional Director of Region 28 (the "RD") then issued an Order Directing Hearing, finding that "the evidence described in the offers of proof submitted by the Employer in support of its Objections could be grounds for overturning the election if introduced at a hearing." ROA.7002-7008. He set a hearing on all 25 Objections and briefly summarized the Objections in his Order. ROA.7007-7008.

The transfer to Region 28 did not deliver the neutrality it was intended to ensure. The RD appointed two Board attorneys to appear as "representatives" for Region 29 to, in his words, "defend and explain" Region 29's conduct. ROA.7298-7304. Amazon moved to exclude Region 29's participation, only to have the RD deny the motion at 7:30 p.m. on the last business day before the hearing opened. ROA.7012-7024; ROA.7298-7304. The same day, the Board's General Counsel denied Amazon's request for the documents and testimony of the Region 29 personnel involved in the election, invoking a policy against Board Agents "becoming enmeshed as a witness in a Board proceeding." ROA.7305-7306.

On June 12, Amazon filed an Emergency Request for Review of its motion to exclude Region 29 from the hearing. ROA.7307-7336. Nearly a month later on July 11—after most of the 24-day hearing had already occurred—the Board denied the request as premature but rebuked the RD's characterization of the representative's role. ROA.7591-7594. The Board held that the RD's "description of the

representatives' role diverges from what is provided in the Casehandling Manual," and instructed that "the representative must exercise self-restraint and display impartiality as well as the appearance of impartiality." ROA.7592-7593. By then, however, the practical value of that instruction was essentially worthless.

Throughout the hearing, the Region 29 representatives had uniformly favored the ALU. Before a single witness was called, the ALU moved to dismiss ten of Amazon's Objections, and Region 29's representative "concur[red] entirely." ROA.71-72. The Region 29 representatives then sided against Amazon in every one of more than 360 evidentiary disputes—and never once objected to the ALU's evidence. ROA.8431-8432. They sought to discredit Amazon's witnesses, joined the ALU's other motions, and on the sixteenth hearing day, the Region 29 representative stated on the record: "Generally, my position is aligned with that of the Union." ROA.3469. Far from exercising the "self-restraint" and "impartiality" required by Board procedure, Region 29 functioned as a second adversary.

Beyond that, Hearing Officer Lisa Dunn ("HO"), who handled the hearing, hamstrung Amazon's presentation of the evidence. For starters, she barred introduction of reams of relevant evidence as beyond the scope of the short summaries of Amazon's Objections contained in the RD's Notice of Hearing, rather

than assessing the evidence against the complete Objections Amazon actually filed.[9] Then when ruling on the merits, she faulted Amazon for failing to present the very evidence she had excluded.

The HO likewise impaired Amazon's ability to develop testimony. Throughout the proceeding, the HO repeatedly excluded admissions by ALU witnesses concerning their critical-period misconduct solely because the admissions were made after the election, *see* ROA.8446 n.11—a rule that would render post-election confessions of ballot fraud and bribery inadmissible. The HO also misapplied hearsay rules, sustaining objections against Amazon while permitting the ALU and Region 29's representatives to elicit comparable testimony without restriction. *Compare* ROA.1606-1611 (sustaining ALU's hearsay objection and prohibiting witness from testifying to what she was told by someone), *with* ROA.4454-4456 (overruling Amazon's hearsay objection and permitting different witness to testify about what *the same person* told him about the incident). Most troublingly, the HO coached Smalls on the record, leading him to deny that the ALU distributed marijuana during the critical period, and refused Amazon's repeated requests to excuse Smalls from the hearing room while the substance of his

[9] *See, e.g.*, ROA.940-943; ROA.1867-1872; ROA.2145-2147; ROA.2719-2724; ROA.2891-2892; ROA.3544-3551; ROA.3633-3635; ROA.4178-4181; ROA.4965-4966; E0368-v; E0549-v; ROA.14223-14446, ROA.14468; E0663-v; ROA.14960; ROA.15219-15225.

testimony was being discussed with counsel. *See* ROA.4550-4557; ROA.4571-4573.

After the hearing, the HO recommended that all 25 of Amazon's Objections be overruled. ROA.8132. Although Amazon's evidentiary presentation went essentially unrebutted—the ALU called only one witness—the HO discredited virtually all of Amazon's 60-plus witnesses. ROA.8488. Amazon filed exceptions to the Report, along with a supporting brief. ROA.8152-8277.

The RD then issued a Decision and Certification of Representative, affirming the HO's Report in all relevant respects. Among other things, he acknowledged that "the Hearing Officer's Report did not fully analyze the objections [as] they were stated in the Employer's April 8 Objections," but held without explanation "[his] narrower summary" controlled. ROA.8363-8364.

#### 2. The Board

Amazon then timely filed a Request for Review with the Board. ROA.8405-8519. While that request was pending, Amazon twice moved to reopen the record after obtaining new evidence through a lawsuit filed by former ALU officers against the ALU and Smalls. ROA.8633-8647; ROA.9205-9219. That lawsuit brought to light key admissions relevant to Amazon's Objections. ROA.9289-9310. Amazon also sought to admit newly released documentary footage

of the ALU's campaign—a subpoena for which the HO had previously blocked. ROA.9205-9206.

On August 29, 2024, a two-Member majority of the Board issued its decision. ROA.9682. Chair McFerran and Member Prouty overruled all of Amazon's Objections, denied the Request for Review, and certified the ALU as the bargaining representative. ROA.9682-9689. The majority addressed each Objection one-by-one. After rejecting each in isolation, they also concluded without explanation that the Objections failed "cumulatively." ROA.9688. And they denied the motions to reopen, deeming the documentary footage "largely duplicative." ROA.9682.

In reaching that result, the majority declined to disturb the RD's core rulings. As to the ALU's conduct, the majority acknowledged the trespass, meeting disruptions, poster destruction, arrest, and election-day threats and confrontation, but found none objectionable when viewed individually. ROA.9682-9689. Distinguishing its precedent on union trespass, the Board said that Smalls was not violent or destructive, entered areas open to visitors, and was arrested well before the election. ROA.9687. The Board also reasoned that the arrest showed only that the conduct influenced how Associates felt, not that it coerced their choice. ROA.9688. Addressing the physical threats against Monarrez, the majority avoided saying whether the threats were serious, focusing instead on the supposed absence of "widespread" dissemination or lasting impact on voters. ROA.9686.

The Board also ratified or ignored Region 29's many missteps. It rejected the late-opening Objection on the ground that a five-to-twelve minute delay could not have disenfranchised a determinative number of voters given the 523-vote margin. ROA.9684. It failed even to address its Agents' disparate treatment of "Vote Yes" vs. "Vote No" insignia in the polling area. ROA.9682-9689. And it treated the Region 29 representatives' adversarial participation as contemplated by the Casehandling Manual and, in any event, non-prejudicial. ROA.9683-9684.

Member Kaplan dissented and would have set aside the election. ROA.9694. Unlike the majority, he applied the precedent holding that "a party's misconduct requires a new election when, taken together, it 'could have changed the outcome.'" ROA.9692 (quoting *Avis*, 280 NLRB at 581, and citing *Robbins & Myers*, 241 NLRB 102, 105 (1979)). Looking only at the ALU's misconduct, he concluded that the Union's "militant" and "aggressive" campaign considered cumulatively—the repeated, knowing trespass in defiance of Amazon's written and oral demands, the taunting of police, the arrests, the disruption of meetings, the destruction of posters, and the election-day threats against Monarrez—"reasonably tend[ed] to interfere with the employees' free and uncoerced choice in the election." ROA.9689-9694.

Kaplan also found the ALU's conduct a direct challenge to Amazon's property rights that conveyed the exact message condemned in the Board's trespass precedent (*Phillips*): that the Employer was "powerless" to protect its rights against

the union. Indeed, he explained, "the objectionable message was stronger and clearer here than in *Phillips*," where no threats or arrests occurred. ROA.9693. He rejected the majority's reliance on timing and margin, observing first that the message never dissipated—Smalls kept trespassing and the ALU kept campaigning on the arrest through the eve-of-election light projection—and second that the 10.8 percent margin was closer than the margin in *Phillips*. ROA.9693. He also emphasized the ALU's own admission, rejected by the HO on relevance grounds, that the February 23 incident was the "turning point" when Amazon "lost the election," confirming that the conduct "could have changed the outcome." ROA.9693-9694.

Because the certification was not directly reviewable, Amazon declined to bargain and litigated the resulting unfair-labor-practice charge. On April 1, 2026, the Board entered its final order finding that Amazon violated Sections 8(a)(5) and (1) of the Act. ROA.10252-10256.

This petition followed.

## SUMMARY OF ARGUMENT

The election certification and unfair-labor-practice charge should be overturned for several independent reasons.

**I.** The Board acknowledged the cumulative-impact standard for assessing election misconduct but failed to seriously apply it. Applied properly to the totality of the undisputed misconduct, that standard requires a new election. This Court should reverse with instructions to order a re-run.

**A.** Under both the Board's and this Court's well-settled precedents, a representation election must be set aside when a party's misconduct, considered cumulatively, reasonably tends to interfere with employees' free and uncoerced choice in the election. Some kinds of misconduct can, standing alone, warrant an election re-run under Board precedent. But the Board in all events must evaluate the impact of all misconduct together and consider such factors as the number, severity, proximity, and persistence of the events.

**B.-C.** The Board failed to perform this analysis. It individually analyzed (and excused) Smalls's trespass campaign, the threatening of Monarrez, the meeting disruptions, and the poster destruction. But it did not then analyze the totality of that misconduct. The Board merely asserted, in the last sentence of the Decision, that Amazon "failed to establish objectionable conduct, both with respect to each individual objection and cumulatively." That conclusory statement does not satisfy

either the Board's or this Court's precedent. Nor does the election margin relieve the Board of its obligation.

**D.** Weighed properly, the totality of the undisputed misconduct compels a new election. The ALU's misconduct over the campaign and into election day sent a clear message: the Union would stop at nothing to win, Amazon could not prevent it, and Associates who opposed it could become targets. As Member Kaplan said in dissent, the ALU "by its own terms wanted to communicate a position of strength and power … that it would fight anyone or anything that stood in its way. And it did just that." Those are not the laboratory conditions promised by the Board.

**E.** This Court should vacate the certification, set aside the derivative bargaining order, deny enforcement, and remand with instructions to order a re-run. Under this Court's case law, that is the remedy when the Board purports to apply the cumulative standard, but fails to do so properly and reaches the wrong result. The Board is not entitled to a do-over.

**II.** The Board's failure to perform the cumulative-impact error analysis is not its only mistake. In its individualized analysis of each Objection, the Board repeatedly altered or ignored the particularized standards that it has developed for certain kinds of oft-occurring defects—union trespass, late poll opening, agent threats, and Board-agent partiality—without acknowledging or explaining the changes. Applied to the same facts that the Board considered, however, the correct

standards would have required a re-run. And because the Board did not properly seek to disavow those standards, they control, and this Court can and should order a new election under any of them.

**A.** To start, the Board improperly replaced the *Phillips* powerlessness inquiry for union trespass with an unsupported ad hoc, multifactor test. *Phillips* asks whether a union's trespass during an organizing campaign went so far as to convey that the employer was "powerless to protect its own legal rights in a confrontation with the Union." *Phillips Chrysler Plymouth, Inc.*, 304 NLRB 16, 16 (1991). If so, a new election must result. That was the case here, as Amazon repeatedly asserted its property rights in writing and in person, and yet Smalls repeatedly returned to JFK8 and even manufactured his arrest on camera. To avoid reaching that conclusion, the Board created new requirements for finding reversible union trespass without acknowledging that it was departing from *Phillips*. This Court should apply *Phillips* and order a new election.

**B.** The Board also departed without explanation from its precedents governing late-starting elections. Under its *Pea Ridge* and *Refresco* decisions, the only question is whether the number of non-voters exceeds the margin; if so, there must be a new election. *Refresco* expressly bars weighing "the number of minutes the polls were not opened as scheduled in relation to the number of non-voting eligible voters who did not cast ballots." *Refresco Beverages US Inc.*, No. 22-RC-276628, 2022 WL

1046078, at *1 (NLRB Apr. 5, 2022). Yet that is what the Board did here, without admitting that it was departing from its prior precedents. This Court should apply *Pea Ridge* and *Refresco* and order a new election because the number of non-voters (nearly 3,500) far exceeded the 523-vote margin.

**C.** Furthermore, the Board augmented without acknowledgment its objective standard for assessing a union agent's threat. Under *Baja's Place*, a union agent's threats cross the line when it "reasonably tends to interfere with the employees' free and uncoerced choice." *Baja's Place, Inc.*, 268 NLRB 868, 868 (1984). That is an objective inquiry, and it was satisfied by what the ALU agents said and did to Natalie Monarrez. Instead, the Board applied a subjective inquiry, asking whether there was actual "widespread dissemination" or "long-lasting impact on voters." This Court should apply *Baja's Place* and order a new election.

**D.** Finally, the Board failed entirely to apply its *Athbro* standard to the election-day actions by Board Agents that reasonably conveyed partiality. *Athbro* applies to Board agent actions that "tend[] to destroy confidence in the Board's election process, or which could reasonably be interpreted as impugning the election standards [the Board] seek[s] to maintain," and a violation requires that an election be set aside. *Athbro Precision Eng'g Corp.*, 166 NLRB 966, 966 (1967). The record here establishes one-directional enforcement of electioneering rules that clearly runs afoul of *Athbro*. The Board did not even apply *Athbro*, and the little explanation

offered for not doing so was wrong. This Court should apply *Athbro* and order a new election.

**III.** Should this Court find no error with the Board's legal standards, as discussed above, it must turn to whether Amazon received a fair hearing. NLRB "[r]epresentation cases, unlike unfair labor practice cases, are not adversarial in nature but are fact-finding hearings." *Alaska Commc'ns Sys. Holdings, Inc. v. NLRB*, 6 F.4th 1291, 1298 (D.C. Cir. 2021). Here, Amazon faced repeated, one-sided rulings that departed consistently from the Board's rules and procedures. That unfair proceeding kept out facts that would have resulted in a different conclusion even under the legal standards the Board applied.

**A.** The Hearing Officer made numerous errors in excluding substantial amounts of Amazon's evidence—and only Amazon's evidence. Most egregiously, she made all of her relevance rulings based not on the actual text of Amazon's Objections (which were extensive and detailed), but rather on the incomplete (sometimes one-sentence) summaries created by the Regional Director. This approach directly conflicted with NLRB Rules applicable to objections proceedings.

**B.** Amazon also faced two adversaries at the hearing: the ALU and the Board's representatives. Before the hearing began, the RD improperly appointed attorneys to appear as "representatives" for Region 29—effectively defense counsel—because Amazon raised objections alleging misconduct by that Region's agents. Those

agents then proceeded to align themselves fully with the ALU, including in every single dispute over evidence Amazon proffered—more than 360 times. At the same time, the Board's General Counsel refused to let Amazon obtain any discovery or testimony from Region 29. But this Court has said that the Board cannot "hide[,] behind a self-erected wall[,] evidence adverse to its interests as a litigant." *NLRB v. Capitol Fish Co.*, 294 F.2d 868, 875-76 (5th Cir. 1961).

**C.** At minimum, this Court should vacate and remand for a lawful post-election hearing.

## STANDARD OF REVIEW

Whether the Board applied the correct legal standard is reviewed de novo. *El Paso Elec. Co. v. NLRB*, 681 F.3d 651, 656-57 (5th Cir. 2012). That inquiry includes whether the Board adhered to its own precedents. *NLRB v. Osborn Transp., Inc.*, 589 F.2d 1275, 1279 (5th Cir. 1979). If the Board departed from those precedents without acknowledging or explaining the change, the resulting decision is considered arbitrary and capricious. *Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 479-80 (5th Cir. 2021). The Court reviews the Board's findings of fact for substantial evidence, but that review "must take into account whatever in the record fairly detracts from" the weight of the Board's conclusion. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951).

Whether the Board afforded Amazon the fair hearing the Act and due process required is also a question of law reviewed de novo. *Boston Insulated Wire & Cable Sys. v. NLRB*, 703 F.2d 876, 880 (5th Cir. 1983). Likewise, the Board's construction of its Rules receives limited deference; the meaning of those Rules "fall[s] more naturally into a judge's bailiwick," and deference is unavailable unless a rule is "genuinely ambiguous" after the Court exhausts the tools of construction. *Nat'l Auto. Dealers Ass'n v. FTC*, 127 F.4th 549, 559 (5th Cir. 2025).

## ARGUMENT

### I. The Board recited the cumulative-impact standard but conducted only an atomized review, requiring a new election.

Under both the Board's and this Court's precedents, a representation election must be set aside when a party's misconduct, considered cumulatively, reasonably tends to interfere with the employees' free and uncoerced choice in the election. The Board's seminal *Avis* decision demands that misconduct be "considered cumulatively" by weighing factors such as "the number of the incidents of misconduct," "the severity of the incidents," and "the degree of persistence of the misconduct." *Avis*, 280 NLRB at 581. Likewise, this Court has long emphasized that it "is not the effect of any one of the objectionable acts standing alone … but the combined effect of all of them, which must be considered" in evaluating whether an "election was conducted in less than the laboratory conditions so often promised by the Board." *Home Town Foods I,* 379 F.2d at 244.

That was the case here. Over the critical period, the ALU's stipulated agents engaged in a sustained campaign of escalating misconduct. They trespassed repeatedly in defiance of written demands and police orders; made violent threats against an Associate on the first day of voting; disrupted and forced the cancellation of employer meetings; destroyed campaign materials; and engaged in a calculated exploitation of a provoked arrest—all as part of a self-described "militant" strategy to demonstrate that the union had "collective power." ROA.4547.

The Board acknowledged most of this conduct, yet refused to order a new election. But it reached that result by judging each Objection on its own, never assessing the "combined effect" of all the misconduct. In response to the dissent's criticism, the Board included a single sentence that Amazon's Objections also failed "cumulatively." ROA.9688. That approach falls well short of the analysis mandated by this Court's and the Board's precedents. When applied properly, the combined effect of all the misconduct clearly interfered with the Associates' free and uncoerced choice. The Court should order a re-run of the election.

### A. The Board's and this Court's precedents require considering the cumulative impact of a party's misconduct.

*Avis* mandates that the Board must weigh numerous factors—including the number, severity, and proximity of misconduct and the degree to which the conduct persisted despite efforts to stop it—to determine whether alleged misconduct, "considered cumulatively," reasonably tended "to interfere with the employees' free and uncoerced choice." 280 NLRB at 581; *see also Holdings Acquisition Co. L.P.*, 356 NLRB 1151, 1151 (2011) (setting aside election where hearing officer "fail[ed] to assess the objectionable conduct as a whole to determine whether it affected the results of the election"); *Fresenius USA Mfg., Inc.*, 352 NLRB 679, 681 (2008) (rejecting individualized assessment of election irregularities where "the cumulative effect of these irregularities … raises a reasonable doubt as to the fairness and validity of the election").

And this Court has repeatedly held the Board to that totality assessment. In *Home Town Foods I*, for example, the Court faulted the Board for taking "each of the employer's objections separately" and concluding that none, viewed alone, would suffice to overturn the election. 379 F.2d at 244. The governing inquiry, the Court held, "is not the effect of any one of the objectionable acts standing alone … but the combined effect of all of them, which must be considered." *Id.* Where objections "viewed cumulatively" show an election held "in less than the laboratory conditions so often promised by the Board and required by the Courts," the certification cannot stand. *Id.*

Other cases agree. *See, e.g.*, *NLRB v. McCarty Farms, Inc.*, 24 F.3d 725, 728 (5th Cir. 1994) (explaining the Court "must review all of the events in their totality in making our determination"); *EDS-IDAB, Inc. v. NLRB*, 666 F.2d 971, 975-76 (5th Cir. Unit B Feb. 4, 1982) (denying enforcement where union misconduct, "considered cumulatively," could be grounds for overturning election); *Howell Refining Co. v. NLRB*, 400 F.2d 213, 218 (5th Cir. 1968) (denying enforcement based on the Board's consideration of "the company's objections to the election separately rather than as a whole in determining whether employees were prevented from exercising a free choice in the election"); *see also Swing Staging v. NLRB*, 994 F.2d 859, 863 (D.C. Cir. 1993) (reversing certification where the Regional Director "failed to assess the cumulative impact of the alleged episodes" and instead

"analyzed each objection solely in isolation"); *NLRB v. Van Gorp Corp.*, 615 F.2d 759, 765 (8th Cir. 1980) ("It is the totality of the circumstances in any particular case that determines whether a free and fair election was held.").

Of course, a single incident of misconduct, standing alone, can warrant a new election. As the D.C. Circuit has explained, the required analysis proceeds in two steps: "the Board first reviews and weighs the seriousness of the specific incidents of alleged misconduct," and then "assess[es] the cumulative impact of the alleged incidents of misconduct in order to determine whether such conduct tainted the results of the election." *PruittHealth-Va. Park, LLC v. NLRB*, 888 F.3d 1285, 1296 (D.C. Cir. 2018). If the Board finds a particularly serious incident of misconduct at the first step, it need go no further. Indeed, the Board has adopted rules tailored to determine whether certain oft-occurring types of misconduct—*e.g.*, trespass, threats, late-opening polls—by themselves require a new election.

But where no individual incident crosses the line, the Board must evaluate the impact of all events together. *Avis* requires an assessment and explanation of the number, severity, proximity, and persistence of *all* misconduct. *See* 280 NLRB at 581. In circumstances where no single incident is itself an error *per se*, the cumulative impact of all the incidents can be.

This Court's decision in *NLRB v. Carlton McLendon Furniture Co.*, 488 F.2d 58 (5th Cir. 1974), is illustrative. There, a union observer's conduct at the polls bore

on only a small number of votes, and a union handbill contained a material misrepresentation. *Id.* at 64. Neither incident was treated as independently dispositive. Still, the Court denied enforcement and remanded, holding that the Board was required to consider the union observer's conduct on the election in conjunction with the handbill's impact. *Id.; see also NLRB v. Claxton Mfg.*, 613 F.2d 1364, 1371 (5th Cir. 1980) (events must be considered cumulatively to determine whether they tended to interfere with outcome of election); *NLRB v. Smith Indus.*, 403 F.2d 889, 895 (5th Cir. 1968) ("An evaluation of the historic facts, without an inquiry into the surrounding circumstances, without viewing those facts cumulatively, and without an opportunity to directly observe and examine witnesses, may lead to erroneous legal conclusions."). The cumulative-impact inquiry does not require any individual incidents that themselves rise to the level of a legal error. Rather, it requires the Board to evaluate the whole record when no individual incidents are found to cross the threshold by themselves.[10]

[10] This cumulative-*impact* standard thus should not be confused with the "cumulative *error* doctrine" familiar from criminal and civil appellate review. That doctrine applies only after a reviewing court has determined that the lower tribunal in fact committed multiple legal errors, but all either lack prejudice or are otherwise individually excusable. *United States v. Delgado*, 672 F.3d 320, 343-44 (5th Cir. 2012) (en banc).

### B. The Board acknowledged the cumulative standard, but did not seriously apply it.

The Board here never undertook a serious cumulative analysis. For the threats against Monarrez, the disruption of meetings, the destruction of posters, and Smalls's trespass and arrest, the Board acknowledged that the conduct occurred but excused each incident on individualized grounds—limited dissemination, isolated nature, temporal remoteness, or the "large" margin of victory. *See, e.g.*, ROA.9686-9688. Those conclusions were themselves incorrect and based on improper legal standards, as discussed in Part II below. But setting that aside, once the Board concluded that no individual error was alone sufficient, it was required to engage with the cumulative analysis required by *Avis*: to explain how those incidents interacted across the full record and why, despite the number, severity, proximity, persistence, and agency of the misconduct, laboratory conditions nonetheless remained intact. *See Avis*, 280 NLRB at 581; *PruittHealth*, 888 F.3d at 1296; *Home Town Foods I*, 379 F.2d at 244. The Board did not seriously do so.

Instead, the Board devoted a single conclusory sentence to the task. After completing its incident-by-incident review, the Board stated simply that Amazon "failed to establish objectionable conduct, both with respect to each individual objection and cumulatively." ROA.9688. It never applied *Avis* to the full course of acknowledged misconduct, never explained how the relevant factors operated across the record as a whole, and never weighed the combined effect of the threats, trespass

and arrest, meeting disruptions, poster destruction, building projection, election-day confrontation, and voting chaos.

The cumulative-impact standard is an analytical requirement, not an incantation. The Board cannot satisfy it by conducting only individualized review and tacking on the word "cumulatively" to its conclusion. Here, the Board answered only atomized questions: whether each incident, separately, required relief. It never seriously undertook the required cumulative question: whether the pattern as a whole reasonably tended to interfere with employee free choice.

Member Kaplan's dissent underscores the point. Applying the cumulative-impact framework, he concluded that "the election must be set aside." ROA.9694. And he did not even reach every Objection because he found that the limited misconduct he analyzed—when considered cumulatively—was sufficient. ROA.9692 n.10. The majority's footnoted responses to the dissent—which merely repeated their incident-by-incident dispositions, ROA.9686 nn.27 & 30—only confirm the Board's failure to perform the required cumulative review.

### C. The margin of victory does not relieve the Board of the cumulative analysis requirement.

The Board's repeated reliance on the margin of victory does not excuse that failure. The closeness of the vote is only one of the *Avis* factors; it is not a threshold that a party must clear before the Board owes it a reasoned cumulative analysis. *Avis*, 280 NLRB at 581. Furthermore, *Avis* requires the Board to consider whether the

misconduct itself helped produce the margin. *United Steelworkers of Am. v. NLRB*, 496 F.2d 1342, 1347 n.11 (5th Cir. 1974) (observing that the Board must "take into consideration that the misrepresentations or coercion was so successful as to cause a wide margin of victory").

Consider this Court's decision in *Claxton*, 613 F.2d 1364. The Court acknowledged that the objecting employer's showing is "particularly difficult to make where … the union won by a wide margin," but held in the same breath that a court "must consider the possibility that the objectionable conduct itself contributed to the margin of victory." *Id.* at 1366. Because the employer had made a prima facie showing that union threats and intimidation raised substantial and material issues, the Court denied enforcement and remanded for a hearing rather than treating the margin as dispositive. *Id.* at 1373. Closeness is a factor to be weighed, not a gate that ends the inquiry.

Applying that rule here, the Board's reliance on the margin fails twice over. It both (1) invoked the margin as though it were dispositive and (2) never asked whether the misconduct may have created that margin. *See also NLRB v. Rolligon Corp.*, 702 F.2d 589 (5th Cir. 1983) (citing *NLRB v. Trancoa Chem. Corp.*, 303 F.2d 456, 458 n.1 (1st Cir. 1962)) (recognizing that "the one-sidedness" of an election "may show how successfully the employees have been misled"). The margin here was only 10.8 percent of valid votes cast, ROA.5611, much smaller than the 20

percent margin in *Phillips*, where a new election was ordered. And the pool of almost 3,500 eligible Associates who did not vote—possibly due to objectionable conduct—was many times the size of the margin. ROA.5611. On this record, the margin could not carry the analytical weight the Board placed on it. *See Exeter 1-A Ltd. P'ship v. NLRB*, 596 F.2d 1280, 1282 (5th Cir. 1979) (setting aside election despite a 13.2 percent margin, with 40 employees not voting); *Scientific Atlanta, Inc.*, 278 NLRB 467, 468 (1986) (setting aside election and directing rerun despite 717-vote margin in favor of union because the misconduct was "far more than de minimis" and declining to require the number of affected votes be shown "with any mathematical certainty"); *cf. Amazon.com Servs., LLC*, 2024 WL 4707054 (NLRB Div. of Judges Nov. 5, 2024) (discussing setting aside the 2021 election at Alabama fulfillment center—which the union lost 738 to 1,798).[11]

### D. Weighed cumulatively, the acknowledged misconduct compels a new election.

Even considering only the misconduct the Board itself acknowledged,[12] the election cannot stand. The acknowledged misconduct satisfies every *Avis* factor: it

[11] Moreover, the HO excluded testimony from ALU organizer Cioffi that Smalls's arrest allowed him to "flip" between 400 and 500 votes to the ALU's side—nearly the entirety of the vote margin. ROA.4966-4969.

[12] Amazon does not concede that the acknowledged misconduct is the full extent of the ALU's misconduct, but contends that conduct alone compels a new election when properly considered in its totality. The extensive evidence that was

was numerous (eight distinct categories), severe (physical threats and arrest), persistent (spanning December 2021 through the final day of balloting), and widely disseminated (through social media, building projections, the VOA board, and breakroom confrontations witnessed by voters). Taken together, the ALU's misconduct sent an unmistakable message: the ALU would stop at nothing, Amazon could not stop it, and Associates who opposed it could become targets of threats and intimidation.

Start with the ALU's disruption of Amazon's ability to communicate with Associates. ALU agents disrupted and forced the cancellation of six meeting sessions and then gloated that they had forced Amazon to "shut [the meetings] down." ROA.6330. They also tore down Amazon's campaign posters. These were not stray incidents of campaign rough-and-tumble. They showed Associates that the ALU could prevent Amazon's message from being heard and could destroy its employee communications with impunity.

That disruption was reinforced by repeated open defiance of property rights and law enforcement. Smalls trespassed again and again despite multiple written cease-and-desist demands, highlighted by his expletive-laden MLK Day rant at JFK8's front door and culminating in his refusal of NYPD directives and insistence

---

excluded improperly—as explained in Part III, *infra*—would only reinforce that conclusion.

that "I am going to leave when I want." ROA.9691; E2805-v; E0344-v at 2:10. After his arrest, Smalls broadcast that he returned to trespass again that very night. The ALU then leveraged Smalls's arrest as a campaign theme: it posted the arrest video, circulated flyers directing Associates to watch it, and projected "THEY ARRESTED YOUR COWORKERS" onto the building hours before voting. ROA.5760; E0326-v. For cumulative-impact purposes, that matters under *Avis* because the arrest was not an isolated trespass episode; it became part of the ALU's broader, escalating campaign to dominate the election atmosphere through confrontation, defiance, spectacle, and intimidation.

The misconduct continued during voting when the Chair of the ALU's Organizing Committee and other agents made direct, violent threats against eligible-voter Monarrez as she held an anti-union sign. They called her a "fucking bitch" and a "fucking traitor," tried to grab her sign, threatened to "kick [her] ass in the parking lot" and "beat [her] up," and announced she "had no right to vote no." ROA.4024; ROA.4058-4059. That conduct occurred at the precise moment when Associates were exercising their Section 7 choice, and it was so alarming that some Associates had to physically intervene to end the confrontation while others verbally reprimanded the ALU agents for their treatment of Monarrez. It transformed the ALU's earlier message of militancy into an immediate warning to any Associate who opposed the union.

The obstacles Associates faced extended beyond the ALU's militant campaign behavior. On the days they cast their ballots, the polling area was neither orderly nor evenhanded. The election began late; voting lines were long and disorganized; Smalls was present in the no-electioneering zone during voting hours; media members and an ALU documentarian photographed, recorded, and interviewed voters as they waited in line; and Board Agents repeatedly allowed "Vote Yes" insignia inside the polling area while demanding that "Vote No" insignia be covered. At the same time, the same Region conducting the election had sued Amazon in federal district court seeking the reinstatement of Smalls's ALU co-founder, and its Regional Director in media statements expressly tied that action to the outcome of the election.

Viewed together, those incidents were not isolated. They were sequential, escalating, and election-focused. As Member Kaplan observed, the ALU "by its own terms wanted to communicate a position of strength and power … that it would fight anyone or anything that stood in its way. And it did just that." ROA.9694. That is the opposite of laboratory conditions. And again, Member Kaplan looked only at the cumulative effect of the ALU's conduct. He did not even add to his calculus Region 29's missteps, which magnified the power of the union's impropriety. Taken together, these events establish an atmosphere incompatible with the laboratory conditions promised and required for a valid election.

### E. The proper remedy is a new election.

This Court has made clear that when the Board does purport to apply the correct standard, but reaches the wrong result, the remedy is to order a re-run, not to invite the Board to try again. After the remand in *Home Town Foods I*, the Board purported to follow the Court's instructions and again upheld the election. This Court denied enforcement, holding that, "[c]oncerning the cumulative facts proved … and in light of the 'laboratory conditions' standard and the express directions contained in our original decision on remand, the Board order is unsupportable on the record considered as a whole." *Home Town Foods, Inc. v. NLRB*, 416 F.2d 392, 399 (5th Cir. 1969) ("*Home Town Foods II*"). And because the proven pre-election and election-day misconduct, "viewed cumulatively," caused "the standard of election campaigning (and conduct)" to "drop[] too low," the Court held that "the requisite laboratory conditions were not present" and that "the experiment must be conducted over again." *Id.* at 400.

*Home Town Foods II* controls here. The Board knew the standard, purported to apply it, but failed to conduct the required weighing. Under *Home Town Foods II*, when the Board's rejection of cumulative impact is unsupported by the record as a whole, this Court may grant the petition for review and deny enforcement outright rather than afford the Board a second opportunity to reach the same result. 416 F.2d at 399-400. The undisputed acknowledged misconduct compels that outcome here.

## II. The Board repeatedly misapplied its own particularized standards.

Though this Court can and should order a rerun based on the cumulative-analysis error, other errors independently require relief. In its objection-by-objection analysis, the Board repeatedly misapplied individualized standards governing whether any specific Objection, standing alone, warrants reversal.

As previously noted, those standards complement the cumulative-impact standard. The cumulative-impact standard compares the election atmosphere as a whole with laboratory conditions; the objection-specific standards address whether a particular defect itself independently warrants relief.

Here, those rules required a rerun for several individual defects, but the Board avoided that result only by narrowing or bypassing them. It narrowed its trespass standard under *Phillips*; replaced its objective poll-timing standard under *Pea Ridge* with a forbidden probability inquiry; applied the wrong standard to an agent's election-day threat under *Baja's Place*; and failed to consistently apply its neutrality standard under *Athbro*. These errors allowed the Board to uphold a certification that the correct standards would not permit. Each such error independently requires denying enforcement, vacating the certification, and remanding for a new election.

To be sure, the Board may change its standards, so long as any new standard remains consistent with the NLRA. But when it does, it must acknowledge the change and provide a reasoned explanation. If it does not, "the Board must faithfully

adhere to the policies and procedures previously announced in its rules and decisions," *Osborn Transp., Inc.*, 589 F.2d at 1279, and "an employer should be able to rely on the Board's adherence to its own policy," *Skyline Corp. v. NLRB*, 613 F.2d 1328, 1332 (5th Cir. 1980).

### A. The Board's decision to replace *Phillips*'s powerlessness inquiry with an unsupported ad hoc multifactor test was arbitrary and capricious.

The Board's treatment of Amazon's trespass Objection is a sub silentio narrowing of *Phillips Chrysler Plymouth, Inc.*, 304 NLRB 16 (1991). *Phillips* asks whether a union's trespass during an organizing campaign conveyed that the employer was "powerless to protect its own legal rights in a confrontation with the Union." *Id.* at 16. When it does, the trespass interferes with employees' free choice and a new election must result. *Id.* Here, the Board imposed new prerequisites to *Phillips* and used them to excuse conduct more egregious than what *Phillips* itself condemned. The Board's Decision is therefore arbitrary because it departed from the Board's announced standard without acknowledgment. *See Osborn Transp., Inc.*, 589 F.2d at 1275. Applied here, *Phillips* requires a new election.

*Phillips* distilled the general rule that union-agent conduct is objectionable if it "reasonably tend[s] to interfere with the employees' free and uncoerced choice," 304 NLRB at 16 (citing *Baja's Place*), to a single "powerlessness" inquiry for claims of union trespass. The union agents in *Phillips* entered the employer's shop, spoke

with employees, and then "repeatedly and belligerently" refused management's requests to leave, even after police were summoned. *Id.* The Board held that this "direct challenge to the Employer's assertion of its property rights" could not have been lost on employees, and that the "message undoubtedly conveyed" was "that the Employer was powerless." *Id*. The Board set the election aside. *See id.* at 16.

*Phillips* thus takes the general *Avis* framework and applies it to a specific, recurring form of misconduct: union trespass that directly challenges the employer's asserted property rights. In that setting, *Phillips* identifies the operative interference as the message the trespass sends to employees—that the employer is powerless to protect its own rights in a confrontation with the union. Where that message is present, the *Avis* inquiry is satisfied; the Board need not separately catalog other factors.

Later cases that found *Phillips* inapplicable did so because that message was absent. In *Edward J. DeBartolo Corp.*, 313 NLRB 382 (1993), the employer "never asserted its property rights." *Id.* at 383. Without an assertion of rights, there could be no direct challenge that made the employer appear powerless. In *Station Operators, Inc.*, 307 NLRB 263 (1992), union representatives interrupted an employer meeting, but "left the premises when told to do so." The episode conveyed compliance with the employer's authority, not defiance of it. And in *Champaign Residential Services, Inc.*, 325 NLRB 687 (1998), the union complied after

"relatively short intervals" and without any "flat refusal to leave" or "significant resistance." *Id.* at 688. Together with *Phillips*, these cases confirm the governing principle: when the union meets the employer's asserted rights with open defiance, it communicates to employees that the employer cannot control its own premises in the confrontation.

The record here satisfies the *Phillips* standard. Amazon repeatedly asserted its property rights in writing and in person, demanding that Smalls and other non-employee organizers leave the JFK8 property. Smalls posted Amazon's December 15, 2021 cease and desist letter on his Twitter account and publicly documented his return to JFK8 the next evening. ROA.5733. He thereafter returned to JFK8, refused countless directives to leave, challenged Amazon to "go ahead and call the cops," and provoked his on-camera arrest by the NYPD in February 2022 while insisting he had a "right to stay." ROA.2405; ROA.9691. And he went back to the property the same evening he was released to continue his campaigning. That was a direct challenge to Amazon's assertion of its property rights.

Furthermore, the union turned the trespasses into a campaign theme. After the arrest, the ALU circulated and promoted the arrest through social media and flyers, and hours before voting it projected "THEY ARRESTED YOUR COWORKERS" onto the JFK8 building. ROA.5760; E0326-v. Did the repeated trespasses send the

message that Amazon was powerless to protect its own property rights in a confrontation with the union? Yes, as the union itself boasted.

Rather than apply *Phillips*, the Board imposed new requirements for union trespass without explanation. It theorized that Smalls's conduct was "not violent or destructive," occurred in areas "normally open to visitors," was not met with a request to leave on every visit, occurred well before the election, lacked proof that eligible voters were aware of it, and involved a 523-vote margin. ROA.5611. None of those is a *Phillips* prerequisite.

As noted, the Board can change its legal tests. But it must acknowledge when it is doing so, and give a reasoned explanation for the change so that a reviewing court can determine whether the new standard complies with the Act and confirm the agency acted within its discretion. *See Osborn Transp.*, 589 F.2d at 1279. The Board did neither here. It did not announce that it was abandoning *Phillips*'s powerlessness inquiry, did not defend its new multifactor prerequisites as consistent with the NLRA, and did not explain why the exact message *Phillips* deemed dispositive should now be subordinated to factors *Phillips* never required. An unacknowledged, unexplained departure of that kind is the model of arbitrary action.

Accordingly, *Phillips* applied, and under it the Board should have ordered a re-run. *Phillips* itself set aside an election after a single episode. This case presents stronger facts. Smalls repeatedly invaded Amazon's premises, defied its demands,

provoked a confrontation that escalated to arrest—and then converted that display of employer powerlessness into sustained campaign fuel, pressing the message throughout voting. *See supra* at 8-14. The message communicated to Associates was not that Amazon once removed a trespasser. It was that Amazon was "powerless to protect its own legal rights in a confrontation with the [ALU]." *Phillips*, 304 NLRB at 16. As Member Kaplan explained, "the objectionable message was stronger and clearer here than in *Phillips*." ROA.9693.

This Court should not remand for the Board to apply *Phillips*. The Board had the standard before it, the dissent applied it, and the majority chose to sidestep it. *See Home Town Foods II,* 416 F.2d at 395 (denying enforcement where the Board "misapplied its orthodox 'laboratory conditions' standard"); *McCarty Farms*, 24 F.3d at 729 (denying enforcement where the Board departed from precedent setting aside elections for "similar, or even less, coercive conduct").

**B. In analyzing the late-election start, the Board imposed a probability analysis that its own precedents forbid.**

In rejecting Amazon's late-start evidence, the Board applied a forbidden probability analysis. ROA.9684 n.11. The Board did not find that the polls opened on time. Instead, it assumed delay of up to twelve minutes and held that a delay of that length "at the beginning of the first polling session could not have possibly disenfranchised a determinative number of voters," given the 523-vote margin. *Id.* The Board theorized that, because the delay was short and the ALU's margin large,

too few of the missing voters would *actually* have appeared and voted during the missed minutes to change the result.

That analysis fails under the Board's own caselaw. The standard established under *Pea Ridge Iron Ore Co.*, 335 NLRB 161 (2001), does not ask whether there was enough time for missing voters to close the margin. Rather, "[w]hen election polls are not opened at their scheduled times, the proper standard for determining whether a new election should be held is whether the number of employees *possibly* disenfranchised thereby is sufficient to affect the election outcome, not whether those voters, or any voters at all, were actually disenfranchised." *Id.* at 161 (emphasis added). This means that if the number of eligible employees who did not vote exceeds the margin, the inquiry ends there. That rule reflects "an objective standard that does not rely on after-the-fact statements obtained from eligible voters as to the reasons why they did not vote." *Pea Ridge*, 335 NLRB at 161. This approach protects not only counted ballots but also "the integrity of the election process" itself. *Wolverine Dispatch, Inc.*, 321 NLRB 796, 797 (1996).

*Refresco* shows how that objective rule bars the very analysis the Board employed here—asking "how likely or probable" non-voters would have voted. There, the polls opened five minutes late, 32 eligible voters did not vote, and the margin was 13. *Refresco*, 2022 WL 1046078, at *1. The RD ruled it was improbable that a determinative number of the 32 non-voters would have voted during the five

minute window. The Board reversed. Its "objective standard does not assess how likely or probable it is that non-voting eligible members would have cast votes during the period when the polls were not open as scheduled," so the RD should not have weighed "the number of minutes the polls were not opened as scheduled in relation to the number of non-voting eligible voters who did not cast ballots." *Id.* Evidence of "which employees did not vote or why … is simply not relevant." *Id.*; *accord Bronx Lobster Place, LLC,* No. 02-RC-191753, 2018 WL 721396, at *1-2 (NLRB Feb. 2, 2018) (vacating election won by two votes but starting seven minutes late, despite uncontroverted testimony that no employees appeared at polls during delay); *Wolverine Dispatch*, 321 NLRB at 796-97 (setting aside election won by four votes where polls were closed for five minutes without evidence that non-voters appeared during closure).

The Board's Decision repeats the *Refresco* Regional Director's error. The Board essentially asked how likely it was that a determinative number of voters would have passed through the check-in tables during the delay at the start of the election. But as *Refresco* explained, the "objective standard does not assess how likely or probable it is that non-voting eligible members would have cast votes during the period when the polls were not open as scheduled." The question is one of *possibility* not *probability*. Here, more than 3,500 eligible voters did not vote—

many times the 523-vote margin. Under *Pea Ridge* and *Refresco*, that satisfies the objective standard and requires setting aside the election.[13]

That strict rule exists because the Board has committed itself to conducting elections under "laboratory conditions." *Gen. Shoe Corp.*, 77 NLRB at 127. A laboratory experiment that does not start on schedule is compromised. *See Prof'l Transp., Inc.*, 370 NLRB No. 132, slip op. at 3 (2021) ("[E]ven the appearance of irregularity in election procedures may cast doubt on the validity of an election and its results."). The Board cannot know what cascading effects flow from a late start—how many voters arrived at the appointed hour and left, how word of the delay spread and discouraged others, or whether later disorder—like the Board Agents' halting of the first voting session to rearrange voting lines—would have occurred at all had voting begun on time. Similarly, the Board's weighing of minutes against voters is based on sheer speculation about how voting would have gone had the election not been delayed. The standard is objective because post-hoc measurement of the delay's effects is impossible.

[13] Even using the Board's own erroneous analysis, it failed to take into account the full extent of the delay. The undisputed record shows that in addition to a late start, the Board stopped the election altogether for approximately 5-6 minutes midway through the first voting period so that Board Agents could reconfigure the voting lines. That delay mattered as well. *See Wolverine Dispatch*, 321 NLRB at 796-97 (setting aside an election where the polls were closed for five minutes during an election, notwithstanding that no one tried to vote during the closure.)

Once again, the Board may change its applicable standards—here, *Pea Ridge* and *Refresco*—but only by acknowledging and explaining the change. It did neither. It did not acknowledge that its reasoning departed from *Refresco* or offer any justification for substituting proof of disenfranchisement for possibility. Because the Board never disavowed its objective standard, *Refresco* and *Pea Ridge* govern. Accordingly, this case should be sent back not for further application of those standards, but for a rerun.

### C. The Board judged the ALU's threats of physical violence on election day under the wrong legal standard.

A union agent's threats are objectionable when they "reasonably tend[] to interfere with the employees' free and uncoerced choice" because "they can reasonably be interpreted as threats of economic retaliation, physical harm, and other unspecified reprisals." *Baja's Place,* 268 NLRB at 868. That is an objective inquiry, too: a court need not "plumb the subconscious" of employees to assess coercive tendency, *McCarty Farms*, 24 F.3d at 730, and subjective reactions or proof of actual coercion are irrelevant, *Van Leer Containers*, 298 NLRB 600, 600 n.2 (1990). That makes sense, as it is one of the core types of objectionable conduct identified in the NLRA. *See* 29 U.S.C. § 158(b)(1) (unlawful for a union "to restrain or coerce" employees).

The threats here met that threshold. ALU agents confronted and threatened Natalie Monarrez repeatedly on the first day of voting, including in the main

employee breakroom twice, where Monarrez was opposing the ALU and holding a "Vote No" sign. That morning, ALU organizers confronted her in the breakroom, screamed and cursed at her and called her a "fucking bitch" and a "fucking traitor." ALU Organizer Anthony approached so closely Monarrez had to step backwards. That afternoon, ALU Organizing Chair Maldonado, ALU Vice-President Palmer, and stipulated agent Daniels confronted her again with loud and violent threats, threatening to "kick [her] ass in the parking lot," "take [her] outside," and "beat [her] up". ROA.4059. The confrontations were alarming enough that many other Associates intervened on Monarrez's behalf each time.

The Board acknowledged all of this occurred, and agreed it was threatening. In fact, it declined to pass on the RD's untenable view that Maldonado telling Monarrez she was going to "kick her ass" and "beat her up" in the "parking lot" were mere "hyperbole and bombast" rather than threats of serious physical harm. Instead, it overruled the Objection on a different ground: that Amazon's evidence "does not establish widespread dissemination or indicate that the incident had a considerable or long-lasting impact on voters." And it (again) emphasized the ALU's large margin of victory.

That was legal error. Dissemination, severity, and timing can matter. *See Holdings Acquisition Co. L.P.*, 356 NLRB 1151, 1153 (2011). But the Board did not merely consider dissemination. It converted dissemination into a requirement—

demanding "*widespread* dissemination" and proof of "considerable or long-lasting impact on voters"—and treated the supposed absence of that proof as dispositive. But *Baja's Place* asks only whether the conduct *reasonably tends* to interfere with free choice; it does not require the objector to prove that the threat *actually* circulated widely or changed votes.

In any event, the record *did* show *immediate and widespread* dissemination. The ALU's attack on Monarrez occurred in the main Associate breakroom, the same location where the ALU set up tables to ensure its campaign messaging would reach as many Associates as possible. ALU agents and organizers accosted Monarrez in the breakroom twice, cursing and getting in her face both times, *in front of many other Associates*. Numerous Associates intervened in the ALU's attacks, some by physically breaking up the confrontation and others by reprimanding the ALU agents and organizers for their treatment of Monarrez. For them and everyone else in attendance, the coercive message was instantaneous. The ALU also brought its attacks on Monarrez to the VOA Board, an electronic messaging platform accessible to all 8,325 JFK8 Associates. Again, dissemination of the ALU's message was acute and widespread.

Neither authority the Board invoked supports its approach. *Lamar Co.* involved non-agent co-workers and a bare "kick ass" threat "without more," 340 NLRB 979, 981 (2003). *Cedars-Sinai* involved anonymous private threats, and

dissemination mattered there only because the question was whether threats not made openly nevertheless reached the electorate, 342 NLRB 596, 596-98 (2004). Here, by contrast, ALU agents and organizers repeatedly threatened Monarrez in front of numerous voters, on the first day of voting. The Board's reliance on the absence of proven voter reactions is particularly unsound given the physical and verbal interventions of other Associates in the breakroom confrontations, and because the Board elsewhere disclaimed reliance on "subjective evidence" of voter perception. *See* ROA.9685 n.19; ROA.9686.

That both of the Board's comparator cases involved non-agents reveals another flaw. Conduct by a party's own agent is judged under the standard set out above: whether it "reasonably tend[s] to interfere" with free choice. *Baja's Place*, 268 NLRB at 868. Conduct by a non-agent third party is judged under a *stricter* standard: it must be "so aggravated as to create a general atmosphere of fear and reprisal rendering a free election impossible." *Westwood Horizons Hotel*, 270 NLRB 802, 803 (1984).

The majority of threats here came from stipulated ALU agents, so the more lenient standard applies. And under that correct objective standard, an explicit threat of physical violence by a stipulated union agent on the first day of voting is the kind of coercive conduct that reasonably tends to interfere with employee free choice. *See* *UNF West, Inc. v. NLRB*, 844 F.3d 451, 462 (5th Cir. 2016) (explaining that "the

presence of a threat implies the absence of a free choice … even though only one percent of the employees were threatened”); *Super Thrift Markets, Inc.*, 233 NLRB 409, 409 (1977) (“We have long held that statements made during election campaigns can reasonably be expected to have been disseminated and discussed among the employees.”).

If the Board believed that repeated, face-to-face election-day threats should be tested by proof of lasting actual impact and “widespread” dissemination—to the extent two separate incidents occurring in front of potential voters each time don’t qualify—it was not free to adopt that requirement silently. That would be a change to the *Baja’s Place* standard, and the Board nowhere acknowledged that it was changing course or explained why its new, more demanding requirement is consistent with the Act’s protection of free choice. Because the Board never disavowed *Baja’s Place*, that standard governs, and under it the threat requires a new election.

Even if the Board had acknowledged and explained a change in the standard, this Court has found comparable conduct objectionable anyway. In *McCarty Farms*, a non-agent walked toward an employee wearing a “Vote No” sticker in the voting line, cursed at him, and advanced within inches of his face, though making no “overt statement” of harm. 24 F.3d at 729. This Court found the non-agent’s conduct objectionable, because the “implication of physical threats [was] reasonably

inferred" and a reviewing court "need not 'plumb the subconscious' of the employees to determine whether the coercive conduct objectively impacted *how* the employees voted." *Id.* at 730; *see also Home Town Foods I,* 379 F.2d at 244 ("We are not impressed with the argument that all coercive acts must be shown to be attributable to the union itself, rather than to the rank and file of its supporters. As the Board has once said, 'The important fact is that such conditions existed and that a free election is hereby rendered impossible.'"). The *McCarty* threat is identical to the one lodged in this case by Anthony at Monarrez in the breakroom: Anthony yelled and cursed at Monarrez for opposing the ALU, pointed his finger in her face and advanced so close that she had to step back to avoid him making contact with her.

### D. The Board ignored its *Athbro* neutrality standard for its agents' one-sided administration of the election.

It is a cornerstone of labor law that the Board's agents must remain neutral when supervising elections. A Board agent's act "which tends to destroy confidence in the Board's election process, or which could reasonably be interpreted as impugning the election standards [the Board] seek[s] to maintain" mandates setting aside an election. *Athbro*, 166 NLRB at 966; *see also Ensign Sonoma, LLC*, 342 NLRB 933, 933 (2004) (*Athbro* violation "requires that an election be set aside."); *see, e.g.*, *Hudson Aviation Servs.*, 288 NLRB 870, 870 (1988) (setting aside a 26-to-5 vote in favor of the union where agent conduct created an impression the Board

disfavored the employer's position by raising her voice at company manager and threatening to stop the election).

This, too, is an objective standard that recognizes the importance of protecting the process. As the Board has explained, *Athbro* protects confidence in the Board's neutrality, so proof that the conduct affected votes is not required. *Ensign Sonoma*, 342 NLRB at 933; *see also Delta Drilling Co.*, 406 F.2d 109, 113 (5th Cir. 1969) (setting aside an election under *Athbro* without any finding of effect on the outcome). Once official conduct reasonably conveys partiality in the polling process, the harm is to the neutrality of the process itself. "No participant in a Board election should be permitted to suggest to the voters that this Government agency, or any of its officials, endorses a particular choice." *Am-O-Krome Co.*, 92 NLRB 893, 894 (1950); *see NLRB v. State Plating & Finishing Co.*, 738 F.2d 733, 740 (6th Cir. 1984) ("The appearance of a compromise of Board neutrality will warrant setting aside an election even if the Board in fact remains neutral.").

The record here establishes one-directional enforcement that reasonably conveyed official disfavor toward "Vote No" expression. Board Agents repeatedly directed voters wearing "Vote No" insignia to cover their shirts before voting. One voter was told, in front of other voters, that she was not allowed inside the voting tent with the "Vote No" shirt on, and that she would not be allowed to vote until she covered up her shirt. ROA.995-997. Another was told, "if you have on that shirt, you

can't vote, so cover it up." ROA.1645. Yet another was told he could not enter the tent until he covered three anti-ALU buttons. ROA.719. Meanwhile, the Region permitted hundreds of voters wearing the ALU's yellow "Vote Yes" lanyards to enter and remain in the voting tent. *See, e.g.*, ROA.2873-2874.

That directional enforcement resembles the neutrality violations the Board has condemned under the *Athbro* standard. In *Glacier Packing Co.*, the Board set aside an election after its agent ripped "Vote NEITHER" pins from employer observers and shouted "[s]hame on you," because witnesses could reasonably interpret that conduct "as indicative that the Board was opposed to the employer's position." 210 NLRB 571, 573 (1974). Directing "Vote No" voters to cover their message while tolerating "Vote Yes" lanyards in the same polling area sends the same kind of official signal.

The Board Agents' instruction to ALU Observer Cassio Mendoza compounded the appearance problem under *Athbro*. Mendoza admitted that Board Agents told the ALU's Observers to alert them to voters wearing "Vote No" shirts. ROA.5033-5034. In *Alco Iron & Metal Co.*, the Board set aside an election where the agent conducting an election had the union's observer translate voter instructions into Spanish for Spanish speaking voters. 269 NLRB 590 (1984). The Board held that this action "conveyed the impression that the Petitioner, and not the Board, was responsible for running the election." *Id*. at 592; *see also N. of Mkt. Senior Servs.,*

*Inc. v. NLRB*, 204 F.3d 1163, 1168-69 (D.C. Cir. 2000) (explaining that "delegating nonminor official election duties to a party" destroys confidence in the election under *Athbro*). Having ALU Observers police "Vote No" shirts, while the ALU's "Vote Yes" lanyards passed without comparable enforcement, likewise suggested that the Board's administration of the election was aligned with the ALU's interests.

The Board's legal error was failing to apply *Athbro* at all. Elsewhere in its Decision, the Board demonstrated awareness and understanding of *Athbro* by drawing a distinction between it and *Polymers, Inc.*, 174 NLRB 282 (1969): *Athbro* applies where Board-agent conduct "reasonably conveys the impression that the Board is biased in favor of (or alternatively, biased against) one of the parties to the election," while *Polymers* applies where agent conduct does not evince bias but deviates from Board procedures in a way that might have affected the results. ROA.9683.

Yet the Board failed to apply *Athbro* to the one-sided enforcement against "Vote No" expression that created the impression of Board support for the ALU. In fact, it did not even discuss this Objection. It simply adopted the RD's reasoning, which was wrong. ROA.9682 n.1. The RD concluded that "the objective interpretation of the Board agents' conduct during the election is to inform voters that electioneering is not permitted within the polling place and to discourag[e] wearing insignia at the polls." ROA.10042. But this purpose-driven analysis misses

the point. *Athbro* applies to the appearance of bias whatever the purpose of the Board Agents' actions. As this Court has said in enforcing the *Athbro* rule, it is "the *appearance* of impropriety against which the Board must guard." *Skyline Corp.*, 613 F.2d at 1332 (emphasis added). Here, voters saw Board Agents tell "Vote No" wearers to cover up on pain of being told they "cannot vote," while "Vote Yes" lanyards passed unchallenged nearby. Whatever the Board Agents intended, the objective appearance was one-sided.

The Board may ask for a remand to apply *Athbro*, but that is not the proper remedy. The standard was squarely presented; the Board itself recognized *Athbro* and its application to several other objections. This Court should simply apply the *Athbro* standard and set the election aside.[14]

## III. The Board denied Amazon a fair hearing by affirming a proceeding in which its subordinate officers repeatedly departed from its procedures to Amazon's detriment.

If this Court finds no error under Parts I or II, it must consider whether Amazon received a fair hearing. Under the proper standards, the Board's decision

[14] The Board also failed to apply *Athbro* to its Agents' inability to prevent the ALU's intrusions into the voting area. It applied the *Milchem Inc.*, 170 NLRB 362 (1968), standard to assess whether Smalls's and others' loitering in the no-electioneering area constituted impermissible electioneering and surveillance *by the ALU*. While the Board's analysis under *Milchem* was incorrect, the Board failed entirely to consider whether, by allowing it to happen in the first place, the Board *itself* (through its Agents) destroyed confidence in the neutrality of the election process notwithstanding whether the Union's conduct amounted to a violation of *Milchem*.

and the election certification should be vacated even on the limited record the Board permitted to be created. But if this Court accepts the (erroneous) legal standards the Board applied, substantial excluded evidence becomes relevant.

NLRB "[r]epresentation cases, unlike unfair labor practice cases, are not adversarial in nature but are fact-finding hearings." *Alaska Commc'ns Sys. Holdings,* 6 F.4th at 1298 (quoting *Springfield Terrace*, 355 NLRB 937, 940 (2010)). They exist to allow the Board to build a record on which it (and this Court) can resolve whether a fair election occurred. "Only a full hearing can enlighten the Board and this Court." *NLRB v. Mr. Fine, Inc.*, 516 F.2d 60, 64 (5th Cir. 1975).

Amazon did not receive the "full hearing" required by law. Its evidentiary presentation was obstructed at every level of the agency. Instead of working to "build a record" as charged, the Board's regional officers constructed an incomplete record by repeatedly departing from the Board's Rules and procedures, substituting truncated summaries for Amazon's Objections, and appointing adversarial "representatives" to defend Region 29. The Board's General Counsel simultaneously shielded Region 29's agents and documents from scrutiny. The Board then certified the election without acknowledging that these procedural departures created the evidentiary gaps it cited against Amazon. Together, these repeated and one-sided errors denied Amazon the "[f]undamental fairness" required by due process of law. *Capitol Fish Co.*, 294 F.2d at 873.

These errors are not material if this Court agrees with Amazon's arguments that the Board failed to apply the correct legal standards properly. As discussed above, even the limited record created by the Board's regional officers requires a re-run under the correct legal standards. *See, e.g.*, *supra* Part II.C.-II.D. But if this Court determines the Board did not err legally, the limited record does matter. The Board's unfair proceedings blocked facts that would have resulted in a different conclusion under legal standards the Board (erroneously) applied.

### A. The Hearing Officer improperly narrowed Amazon's Objections and then excluded Amazon's evidence based on that narrowing.

Before the first witness was called, the HO misconstrued Board Rules and procedures to deny Amazon a full hearing. She evaluated the relevance of all evidence sought to be introduced against the truncated summaries of Amazon's Objections created by the RD, rather than the complete Objections Amazon actually filed. This was a misconstruction of the Board's Rules that should be given no deference by this Court. *See Nat'l Auto. Dealers*, 127 F.4th at 559.

#### 1. Board Rules do not allow a Hearing Officer to "dismiss" or narrow objections set for hearing by a Regional Director.

The Board's Rules & Regulations provide that after the tally of ballots has been prepared, any party may file objections to the election "which shall contain a short statement of the reasons therefor[e] and a written offer of proof[.]" 29 C.F.R. § 102.69(a)(8). If the Regional Director concludes that the offered evidence could

warrant setting aside the election, he *must* direct a hearing, at which the parties may introduce evidence of significant facts supporting their contentions. 29 C.F.R. § 102.69(c)(1)(ii). The NLRB Casehandling Manual Part Two – Representation Proceedings ("CHM"), a policy guide prepared by the Board's General Counsel for use in representation cases, recognizes that a party's "short statement" of reasons "constitutes an essential part of the objections." CHM § 11392.5. At the same time, the CHM provides that a Regional Director may summarize a party's objections in his notice of hearing. *See* CHM § 11395.2. ("If a Regional Director decides to send some or all of the objections to a hearing, they should issue a notice of hearing on objections before a Hearing Officer … no further investigation should be conducted and the facts may be set forth in summary form.").

When the RD here set this matter for a hearing, he chose to summarize Amazon's Objections in his Notice. *Compare* Notice of Hearing *with* Objections. For example, Amazon's Objection 16, concerned with the ALU's trespass campaign, stated the following:

> Non-employee ALU organizers repeatedly trespassed on Amazon's property. Over the course of many months, Amazon informed non-employee ALU organizers on several occasions that they had no right to solicit on Amazon's property and that their presence on Amazon's property constituted unlawful trespass. Nevertheless, Mr. Smalls and other non-employee ALU organizers continued to trespass on Amazon's property for the purpose of soliciting employee support during the critical period. On February 23, 2022, during the critical period, Mr. Smalls and two ALU organizers initiated a confrontation with the New York Police Department after Mr. Smalls repeatedly

> refused to leave Amazon's property, which resulted in their arrests. After his arrest, Mr. Smalls and the ALU consistently misrepresented what had occurred, claiming that he [was] merely dropping off food for employees and was akin to an Uber Eats driver, and that Amazon "called the cops on employees." Mr. Smalls consistently failed, however, to mention in his social media posts and interviews on the subject that on the date of his arrest, he brought a film crew onto Amazon's property without authorization, conducted an interview (that can be seen on social media), and then proceeded to trespass and loiter for over one hour. The ALU also filed ULP charges—which the Region has yet to investigate—and falsely alleged that Amazon had "violated its national settlement" with the NLRB. The ALU then amplified these misrepresentations and the pendency of the charge in the media. *All of these actions* had a reasonable tendency to interfere with laboratory conditions. *See Phillips Chrysler Plymouth*, 304 NLRB at 16 (Board set aside election when union agents invaded the employer's premises without permission and refused to leave when asked, engaging in a confrontation with company management.)
>
> Footnote: *See Addison Post, Amazon Did Everything it Could to Bust the Staten Island Union. They Overcame It All*, THE INTERCEPT (Apr. 2, 2022), https://theintercept.com/2022/04/02/amazon-union-staten-island/.

ROA.6991-6992 (emphasis added). In contrast, the RD summarized Objection 16 in eight words as follows:

> Non-employee Petitioner organizers repeatedly trespassed on the Employer's property.

ROA.8390.

The RD's summaries of Amazon's Objections did not, however, displace Amazon's actual Objections. To do that would mean the RD had set aside the Objection, and Board Rules are clear that there is only one way to do that: in a decision. The Rules say:

> If timely objections are filed to the conduct of an election … and the Regional Director determines that the evidence described in the accompanying offer of proof would *not* constitute grounds for setting aside the election if introduced at a hearing … the Regional Director *shall issue a decision disposing of the objections*[.]

29 C.F.R. § 102.69(c)(1)(i) (emphasis added).

But the RD did not dismiss any of Amazon's Objections, or issue *any* decision, before hearing. Instead, he issued a Notice setting the Objections for hearing, writing that "the evidence described in the offers of proof submitted by the Employer in support of *its objections* could be grounds for overturning the election if introduced at a hearing." ROA.7002-7008 (emphasis added). Accordingly, he ordered an evidentiary hearing "for the purpose of receiving evidence to resolve the issues raised with respect to *the objections*." ROA.7008 (emphasis added).

The HO's task at the hearing was thus straightforward: receive all evidence relevant to *Amazon's Objections*. *See* 29 C.F.R. § 102.64(b) (Hearing Officer's duty is "to inquire fully into all matters and issues necessary to obtain a full and complete record"). But when the hearing began, she tied all of her evidentiary rulings to the RD's arbitrary abbreviations of Amazon's Objections in the RD's Notice. She barred Amazon from pursuing lines of inquiry, excluding hundreds of exhibits and entire lines of testimony, on the ground that they fell outside the scope of the truncated summaries—even though they fell squarely within the text of the actual Objections. *See supra* note 6 and accompanying text. She then recommended overruling many

of the Objections because the record lacked the very evidence she refused to admit. ROA.8010-8011; ROA.8047; ROA.8050-8051; ROA.8064; ROA.8075-8080; ROA.8095-8096; ROA.8110-8113.

The HO's reliance on the summaries—rather than the Objections themselves—stems from a novel misreading of a single statement in the CHM: "[t]he Hearing Officer has authority to consider only the issues that are reasonably encompassed within the scope of the specific objections set for hearing by the Regional Director." CHM § 11424.3(b). ROA.159-160; ROA.1867-1871; ROA.7997. Nothing in that statement allows the HO to rely on summaries. The plain text refers to "the *specific objections* set for hearing by the Regional Director." *Id.* (emphasis added). As noted earlier, where the CHM means the Regional Director's summaries, it says so expressly. *See, e.g.*, CHM § 11395.2.

That understanding of "objections" is bolstered by the very next sentence in the CHM. The entirety of that paragraph states:

> The Hearing Officer has authority to consider only the issues that are reasonably encompassed within the scope of the specific objections set for hearing by the Regional Director. *Allegations based on a new legal theory or different factual circumstances* are insufficiently related to the objections set by the Regional Director for hearing.

CHM § 11424.3(b) (emphasis added). The highlighted text in the next sentence is best read as requiring the HO to hold the objecting party—here, Amazon—to *that party's own words*. It bars a Hearing Officer from accepting new "[a]llegations"

*from the party* that differ from the objections previously stated and accepted by the Regional Director. *Id.* The provision is not a license for the HO to replace a party's objections with the scaled-down summaries usually reflected in hearing notices.

The nature of the CHM further cuts against the HO's reading of it. The CHM's preamble states that the manual "has been neither reviewed nor approved by the Board," "is not a form of binding authority," and that its guidance "should not be viewed as binding procedural rules." CHM, Purpose of the Manual. The HO therefore could not treat CHM § 11424.3(b) as controlling—much less read it to authorize a narrowing of objections that the Rules themselves do not permit. But on the HO's reading, the CHM would conflict with at least two binding Rules: the Rule requiring the RD to issue a "decision" before dismissing objections prior to hearing, 29 C.F.R. § 102.69(c)(1)(i), and the Rule requiring the HO to "inquire fully" into the issues raised at an objections hearing, 29 C.F.R. § 102.64(b). The CHM should be read consistently with those Rules, not as an exception to them.

Finally, the HO's approach was at odds with the leeway the Board provides to develop evidence in representation proceedings. Board precedent has consistently read objections broadly in determining admissibility. *See, e.g., Fred Meyer Stores, Inc.,* 355 NLRB 541, 543 n.7 (2010) (allowing union raising objection under one legal theory to pursue a different theory at objections hearing, noting the unalleged theory "was reasonably encompassed by, and sufficiently related to" the objection);

*Fiber Indus.*, 267 NLRB 840, 840 n.2 (1983) (holding that when party seeks to introduce evidence that does "not exactly coincide with the precise wording of the objections," the evidence should be allowed if it is "sufficiently related" to the objections). The HO's contrary (and inaccurate) read of the CHM went in the opposite direction.

The RD mainly dealt with the HO's error by acting as if it did not happen. He first approved her erroneous interpretation of the CHM without analysis, declaring that where his description of the Objections in the Notice was narrower than those Amazon had lodged, "the former … controls." But he then went on to contend that the HO actually "considered all issues raised in either iteration [*i.e.*, Amazon's or his] of this objection." ROA.8365.

That is demonstrably false. The HO made clear in her Report that she was considering only the summaries, writing that she was "responsible for receiving evidence on the matters set for hearing in the Regional Director's order directing hearing on objections" and "required to limit the scope of the hearing to those matters." ROA.7997. And she did exactly that—*repeatedly* constraining the hearing to the summaries and admonishing Amazon's counsel to stop trying to present evidence based on the company's original Objections. *See, e.g.*, ROA.160 ("What's before me is Objection 2, as stated in the Regional Director's order…. I am not going to take anything other than that."); ROA.1868 ("The objections before me are clearly

delineated in the order directing hearing and notice of hearing on Objections from the Regional Director of Region 28. Objection 16 … I'm going to quote the entire objection, it's one sentence. 'Non-employee Petitioner organizers repeatedly trespassed on the Employer's property,' period. That is the objection before me.").

#### 2. The Regional Director's failure to correct the Hearing Officer's errors prejudiced Amazon.

The HO's mistakes were not trivial. The RD thought so, opining that, "even if the Hearing Officer did err by relying on [the summary of Objections], no prejudice or harm resulted because … [h]aving reviewed the record, including the rejected exhibits in light of the exceptions, I find no evidence was excluded that would result in sustaining any objection or changing the outcome of this proceeding." ROA.8363-8364. This analysis collapses under minimal scrutiny. The HO's reliance on the truncated summaries prevented Amazon from putting on a variety of relevant evidence. ROA.159-160; ROA.940-943; ROA.1867-1872; ROA.2145-2147; ROA.2719-2724; ROA.2891-2892; ROA.3544-3551; ROA.3633-3635; ROA.4178-4181; ROA.4965-4966.

For example, for Objection 16 on the issue of trespass, the HO refused any evidence besides what she deemed relevant to the Notice's one sentence summary: "Non-employee Petitioner organizers repeatedly trespassed on the Employer's property." ROA.8390. But the full text of Objection 16 explained in detail *how and why* the ALU's conduct was objectionable. ROA.6991-6992.

This distinction is critical, because the additional text of the Objection goes directly to what the HO found lacking under *Avis*.[15] As the HO acknowledged in her Report, *Avis* includes factors such as "the degree of persistence of the misconduct in the minds of the bargaining unit employees," and "the extent of dissemination of the misconduct among the bargaining unit employees." ROA.8111; *see Avis*, 280 NLRB at 581. Those very questions were encompassed by the full text of the Objection, but not by the RD's one-sentence summary.

When Amazon attempted to elicit testimony from bargaining unit employees addressing these factors, the HO rejected it, claiming it was "irrelevant" and outside the scope of Objection 16. She did not allow Associate Stephanie Lopez to testify about Smalls's trespass and arrest or the dissemination of these events to the bargaining unit. ROA.2719-2723. She prevented Associate Moises Martinez from discussing the impact of Smalls's arrest on other Associates. ROA.3289-3291. She did not allow Associate Adina Goriva to testify about her recollection of Exhibit 595—an ALU flyer about Smalls's February 23 trespass and arrest distributed to bargaining unit employees "a week or two" before the election. ROA.449; ROA.932-943. She refused the admission of an article quoting Cioffi that seeing

---

[15] As Amazon noted above, Objection 16 should have been analyzed under the powerlessness inquiry of *Phillips*, but here we assume application of the legal standards applied by the Board, RD, and HO.

Amazon's treatment of Smalls "tipped him over" to support the Union and that he was thereafter able to "flip" between 400 and 500 votes. ROA.4966-4969. She even cut off questioning of Smalls himself, ruling that the ALU's dissemination of his arrest on social media was beyond the scope of Objection 16. ROA.4618-4619.

Having excluded that evidence, the HO then relied on its absence to conclude that Amazon had not presented "any" evidence showing the impact of Smalls's trespassing campaign on would-be voters. ROA.8111. The RD's assertion that there was no prejudice from the HO's reliance on the summaries, *see* ROA.8363-8364*,* is plainly incorrect.

### B. The Board let Region 29 prosecute Amazon as its adversary while withholding the Region's own agents and documents.

In addition to evidentiary restrictions, Amazon faced adversarial opposition not just from the ALU but also the Board itself through Region 29's representatives. This, too, contravened Board process and precedent.

Before the hearing began, the RD appointed attorneys to appear as "representatives" for Region 29 at the hearing. ROA.7298-7304. This was an uncommon procedural maneuver, done only because Amazon raised objections alleging misconduct by the Board itself (acting through Region 29). Amazon believes that such an appointment should have come from Region 28 and not 29.[16]

[16] Board Rules provide only that a "party" may appear at a post-election objections hearing "by counsel, or by other representative." 29 C.F.R.

But in all events, the CHM makes clear that such representatives must "exercise self-restraint and display impartiality as well as the appearance of impartiality." CHM § 11424.4(b). Moreover, the "primary function" of a Regional Director's representative is not to advocate for or against any other party, but to "see that the relevant evidence adduced during the region's administrative review becomes part of the record." *Id*.

Despite these guidelines, the RD charged Region 29's representatives not to act as impartial presenters, but as defense counsel to "defend" Region 29 against Amazon's Objections. ROA.7298-7304; ROA.8431-8432. As noted above, Amazon moved to exclude the Region 29 representatives from the hearing, arguing that there was no way representatives of Region 29 could avoid partisanship, given the allegations. ROA.7012-7024. In denying Amazon's request (albeit towards the end of the hearing), the Board deemed Amazon's concerns "speculative," opining that "any allegations of prejudice are more appropriately raised at the conclusion of the

---

§ 102.69(c)(1)(iii). Region 29 was not a party, a fact the Region itself acknowledged prior to the hearing. ROA.7017. Rather, the term "party" in this context means "the Regional Director in whose Region the proceeding is pending." 29 C.F.R. § 102.1(h). That was Regional Director Overstreet, the Director of Region 28 to whom Amazon's Objections had been transferred. Consistent with that, the CHM provides that the Regional Director handling the objections may "assign a Board agent designated as representative of the Regional Director to appear at the hearing to see that evidence adduced during the region's investigation becomes part of the record." CHM § 11424.

hearing." ROA.7592. But importantly, the Board criticized the RD's language in appointing the representatives, ROA.7592, and emphasized the CHM's instruction that "the primary function of a representative of the Regional Director is to see that the relevant evidence adduced during the region's administrative review becomes part of the record" ROA.7591 (quoting CHM § 11424.4(b)). And the Board instructed that "the representative must exercise self-restraint and display impartiality as well as the appearance of impartiality." *Id.* (quoting CHM § 11424.4(b)).

Region 29's representatives did not meet that standard. Before the first witness was called, they supported the ALU's purported "motion to dismiss" several of Amazon's Objections (in direct tension with RD Overstreet's decision to set the Objections for a hearing in the first place). ROA.71-72. They then continued their anti-Amazon advocacy throughout the hearing. Region 29's representatives sided against Amazon in every single dispute over evidence Amazon proffered—more than 360 times—and never once objected to the ALU's evidence. ROA.8431-8432. They cross-examined Amazon's witnesses, seeking to limit and discredit the testimony of hourly employees every time those employees tried to describe the actions of Region 29.[17] One of the Region 29 representatives admitted, on the record,

[17] ROA.552-562; ROA.632-639; ROA.685-691; ROA.743-750; ROA.809-817; ROA.865-868; ROA.969-974; ROA.1042-1050; ROA.1073-1079, ROA.1149-1152; ROA.1197-1198; ROA.1233-1236; ROA.1284-1291;

that "generally, my position is aligned with that of the Union." ROA.3469; ROA.8431-8432.

At the same time, the Board's General Counsel refused to let Region 29 personnel testify at the hearing and denied Amazon's requests for production of relevant Board documents. ROA.7305-7306. Amazon sought production of records in Region 29's possession relating to its handling of the election. ROA.7378-7381. Amazon also sought to subpoena the Region 29 Agents handling the election to testify. ROA.7382-7388. The General Counsel, however, refused to allow it. She argued, citing to no Board Rule or case precedent, that it was "the policy of the Office of the General Counsel not to permit Board agents to testify as witnesses with respect to the processing of unfair labor practice or representation cases." ROA.7305-7306. She claimed the risk of a "Board agent becoming enmeshed as a witness in a Board proceeding" was too great to allow Region 29's Agents to testify. ROA.7547-7548. She also denied Amazon's requests for Region 29's communications and obtained revocation of Amazon's subpoenas *duces tecum*. ROA.7409-7411.

---

ROA.1318-1321; ROA.1364-1369; ROA.1444-1447; ROA.1536-1537; ROA.1577-1581; ROA.1658-1661; ROA.1788-1801; ROA.2127-2129; ROA.2168-2171; ROA.2194-2195; ROA.2223-2225; ROA.2262-2263; ROA.2382-2384; ROA.2516-2518; ROA.2703-2706; ROA.2746-2750; ROA.2787-2789; ROA.2842-2850; ROA.3116-3122; ROA.3168-3170; ROA.3209-3210; ROA.3265-3269; ROA.3382-3390.

In short, the Board put Amazon in a double-bind and behaved inconsistently in doing so. It permitted Region 29 to participate as an adversarial party, voice support for the Union, and cross-examine dozens of Amazon's witnesses—*i.e.*, to "enmesh[]" itself in the Board proceeding. At the same time, it claimed that answering Amazon's charges through discovery or on the witness stand would somehow "enmesh[]" the Region too deeply. This construct is inconsistent with fundamental fairness and due process. Indeed, this Court has said that the NLRB "cannot hide[,] behind a self-erected wall[,] evidence adverse to its interests as a litigant." *Capitol Fish*, 294 F.2d at 875.

The HO reasoned that, in any event, the Region's joinder "caused no prejudice because [Amazon's] arguments … fail on their merits." ROA.7998-7999. But that inverts the impartiality requirement. A partisan process cannot be validated by the outcome it produced; the propriety of the process is antecedent to who prevailed.

### C. The Board refused meaningfully to address any of these errors on review.

The Board failed to grapple with these and the many other one-sided errors committed at the hearing. *See also supra* at 22-26.

As to the scope of the hearing, the Board claims to have reviewed all of Amazon's rejected evidence and determined that "even if it had been admitted at the postelection hearing, [the rejected evidence] would not warrant a second election" and therefore there was no "prejudicial error." ROA.9682. A conclusory assurance

cannot substitute for reasoned analysis where the errors are numerous and systematic. *See Renew Home Health v. NLRB*, 95 F.4th 231, 243 (5th Cir. 2024) ("[W]ithout sufficient analysis, the Board's conclusory holding … cannot be evaluated for its plausibility."); *Be-Lo Stores v. NLRB*, 126 F.3d 268, 279 (4th Cir. 1997) ("Where an ALJ provides no more than a generalized, conclusory statement purportedly incorporating a host of individual comparative credibility determinations with respect to multiple witnesses, we refuse to indulge the presumption that its findings are entitled to the ordinary deference.").

Moreover, the Board's claim to have reviewed "all" rejected evidence is undermined by its Supplemental Record filings, which acknowledge that certain evidence and Amazon's Offer of Proof cannot be located. *See* Dkt. Nos. 134-1, 135; *see also Texas v. EPA*, 122 F.4th 1008, 1009 (5th Cir. 2024) (where "the administrative record lacks key evidence … , any explanation for EPA's actions in the Final Rule would run 'counter to the evidence before the agency'").

As to the participation of Region 29's "defend[ers]," the Board never reconciled their actions with its prior decision denying Amazon's motion to exclude them. It excused the Region's advocacy as "explicitly contemplated by [CHM] Section 11424.4(b)." ROA.9682. But it nowhere explained how the Regional representatives comported with the Board's own instruction—given in denying Amazon's request to exclude those representatives—that "the primary function of a

representative of the Regional Director is to see that the relevant evidence adduced during the region's administrative review becomes part of the record." ROA.7592 (citing CHM § 11424.4(b)). Again, a representative can participate only on the express conditions of "self-restraint," "impartiality," and "the appearance of impartiality." CHM § 11424.4(b). None of those were apparent here.

The hearing's defects independently require vacatur. If the Court does not direct a new election based on the errors addressed in Parts I and II above, it should vacate and remand for a lawful post-election hearing.

## CONCLUSION

The Court should grant Amazon's petition for review, set aside the Board's April 1, 2026 order in whole, deny enforcement, vacate the certification on which that order rests, and remand with instructions to the Board to rerun the election on the petition filed by the ALU on December 22, 2021. In the alternative, the Court should vacate and remand for a lawful post-election hearing and a reasoned Board decision applying the correct legal standards.

Respectfully submitted,

/s/ *Elbert Lin*

Elbert Lin
Kurt G. Larkin
Kevin S. Elliker
HUNTON ANDREWS KURTH LLP
Riverfront Plaza, East Tower
951 East Byrd Street, Suite 700

Amber M. Rogers
HUNTON ANDREWS KURTH LLP
Fountain Place
1445 Ross Avenue, Suite 3700
Dallas, Texas 75202
Telephone: 214-979-3000

Richmond, Virginia 23219
Telephone: 804-788-8200

*Counsel for Petitioner*
*Amazon.com Services LLC*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with Federal Rule of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in 14-point Times New Roman, a proportionally spaced font, and that it complies with the type-volume limitations of Rule 32(a)(7)(B) and the Court's July 16, 2026 Order, Dkt. No. 131-1, because it contains 19,498 words, excluding the parts exempted by Rule 32(f), according to the count of Microsoft Word.

*/s/ Elbert Lin*
Elbert Lin
*Counsel for Petitioner*
*Amazon.com Services LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on August 10, 2026, I electronically filed this brief with the Clerk of this Court by using the appellate CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

*/s/ Elbert Lin*
Elbert Lin
*Counsel for Petitioner*
*Amazon.com Services LLC*